**THIRD DIVISION
MILLER, P. J.,
RAY and BRANCH, JJ.**

**NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/**

**November 29, 2012**

# In the Court of Appeals of Georgia

A12A1265. BEALE v. O'SHEA.

BRANCH, Judge.

Between 2000 and 2010, Scott A. Beale and Roderick O'Shea were business partners, with each man owning 50% of FlightWorks, Inc. This dispute arises out of the ultimately successful efforts of O'Shea to purchase Beale's ownership interest in the company. As a result of that transaction and the events leading up to it, Beale asserted claims against O'Shea for fraud, breach of contract, and breach of fiduciary duty.[1] The parties filed-cross motions for summary judgment, with O'Shea seeking summary judgment on all claims asserted against him by Beale and Beale seeking

---

[1] As explained more fully below, this lawsuit was initiated by O'Shea and Beale's claims were asserted as counterclaims. After O'Shea obtained Beale's shares in FlightWorks, however, he dismissed his claims against Beale and the parties were re-aligned with Beale as the plaintiff.

summary judgment on his claims resulting from O'Shea's failure to honor a stock purchase agreement between the men. The trial court granted Beale's motion for partial summary judgment and awarded him $384,822 plus prejudgment interest of $36,088.92 on his claim that O'Shea had breached the parties' stock purchase agreement. However, the court granted O'Shea's motion for summary judgment on all other claims asserted against him by Beale. Beale now appeals, arguing that the trial court erred in granting O'Shea summary judgment on Beale's claims arising out of: (1) O'Shea's execution of what the parties refer to as the "Change in Control Protection Agreements;" and (2) O'Shea's alleged withholding of the distribution of FlightWorks profits, in violation of the parties' shareholder agreement. As is explained below, we find that the record contains sufficient evidence to create a jury question as to whether Beale suffered any damages as a result of O'Shea's execution of the Change in Control Protection Agreements. Accordingly, we reverse the trial court's order granting O'Shea summary judgment on Beale's claim for breach of fiduciary duty relating to the Change in Control Protection Agreements. We also find that the record shows the shareholder tax distributions allegedly withheld from Beale were in fact made and were credited against outstanding balances on loans FlightWorks had previously made to Beale. We therefore affirm the order of the court

below granting O'Shea summary judgment on Beale's claims for breach of contract and breach of fiduciary duty relating to tax distributions required under the shareholder agreement.

Denial of summary judgment is warranted when any material fact is undisputed, as shown by the pleadings and record evidence, and this fact entitles the moving party to judgment as a matter of law. *Cowart v. Widener*, 287 Ga. 622, 623 (1) (a) (697 SE2d 779) (2010). To prevail on a motion for summary judgment, therefore,

> the moving party must show that there is no genuine dispute as to a specific material fact and that this specific fact is enough, regardless of any other facts in the case, to entitle the moving party to judgment as a matter of law. When a defendant moves for summary judgment as to an element of the case for which the plaintiff, and not the defendant, will bear the burden of proof at trial . . . the defendant may show that he is entitled to summary judgment either by affirmatively disproving that element of the case or by pointing to an absence of evidence in the record by which the plaintiff might carry the burden to prove that element. And if the defendant does so, the plaintiff cannot rest on his pleadings, but rather must point to specific evidence giving rise to a triable issue.

(Citations and punctuation omitted.) *Strength v. Lovett*, 311 Ga. App. 35, 39 (2) (714 SE2d 723) (2011). "We review the denial of a motion for summary judgment de novo,

3

viewing the evidence in the record, as well as any inferences that might reasonably be drawn from that evidence, in the light most favorable to the nonmoving party." (Citation omitted.) *Vann v. Finley*, 313 Ga. App. 153, 155 (721 SE2d 156) (2011).

Viewed in the light most favorable to Beale, as the non-movant, the record shows that the Flight Works Amended and Restated Shareholders Agreement (the "Shareholders Agreement"), which was signed by both Beale and O'Shea and became effective January 1, 2005, called for a five-person Board of Directors. It granted O'Shea the authority to elect three directors and Beale the authority to elect two. Until sometime in 2009, however, O' Shea and Beale, who was also employed by FlightWorks, served as the company's sole directors. In 2009, O'Shea discovered that Beale had unilaterally authorized FlightWorks to guarantee $8.25 million in loans from Huntington National Bank ("HNB") to Beale, his wife, and/or entities they owned. After making that discovery, O'Shea fired Beale as a FlightWorks employee and exercised his right to elect two additional members to the FlightWorks Board of Directors. O'Shea elected Daniel T. Lucey, FlightWorks President, and William Lewis, FlightWorks CFO. Following the election of Lucey and Lewis in June 2009, Beale was removed from the board.

4

Feeling that Beale's conduct had left the company's future in question, Lucey and Lewis had their lawyer prepare for each of them a document entitled "Change in Control Protection Agreement." Those agreements provided that if the control of FlightWorks changed such that O'Shea no longer owned at least 50% of the company, then at the closing of the sale of stock resulting in the change in control of FlightWorks, Lucey and Lewis would be entitled to severance pay.[2]

In August 2009, Beale entered into a forbearance agreement with HNB under which the bank agreed to forbear on the past due loans made to Beale and guaranteed by FlightWorks in exchange for Beale pledging his FlightWorks shares to HNB as collateral. This agreement required Beale to get prior approval from HNB before selling, transferring, or encumbering his FlightWorks stock.

The Shareholders Agreement contains a compulsory sale provision, pursuant to which each shareholder had the right to solicit and present bona fide third-party offers to purchase all the shares of FlightWorks. Under that provision, if one shareholder receives a bona fide third-party offer, the other shareholder is required

---

[2] The Change in Control Agreements set forth a formula for calculating this severance pay. Throughout this litigation, Beale has contended that this amount would be $400,000 each for both Lucey and Lewis, or $800,000 total. O'Shea does not appear to dispute this calculation.

either to match that offer and purchase the shares of the selling shareholder or he must join in the sale and sell his shares to the third party at the price agreed to by the selling partner.

In November 2009, FlightWorks Holdings, LLC ("Holdings"), an entity formed by Beale and Sean Boyd[3] for the express purpose of acquiring FlightWorks, submitted an offer to Beale for the purchase of his stock (the "First Right Offer") that would have netted Beale approximately $3.8 million. Beale accepted the offer and notified O'Shea of this fact.[4] Thus, pursuant to the Shareholders Agreement, O'Shea had 60 days either to agree to sell his shares at the price offered by Holdings or to purchase Beale's shares at the same price.

Believing that the offer from Holdings was not a bona fide third-party offer, O'Shea initiated this litigation in January 2010 seeking a declaratory judgment as to whether the offer was a valid offer, obligating him either to purchase Beale's

_____

[3] Boyd was a principal in Konsortium Capital Partners, a corporate finance firm that worked to find financing for FlightWorks Holdings' proposed buyout of FlightWorks.

[4] It appears that, despite the requirement in the forbearance agreement that he do so, Beale did not obtain the prior approval of HNB before accepting this offer.

FlightWorks shares or to sell his own shares.[5] O'Shea also sought and received an order requiring the parties to maintain the status quo until either the resolution of the lawsuit or Holdings's withdrawal of its offer.

On May 11, 2010, Beale and Holdings rescinded and withdrew the First Right Offer and simultaneously submitted an Amended First Right Offer. That offer set the purchase price of all FlightWorks' shares by Holdings at "$13,500,000 . . . minus the balance due O'Shea for shareholder loans by him to [the] Company with the remainder divided by the number of shares of the Company then authorized, issued, and outstanding." Also on May 11, the FlightWorks Board of Directors voted to approve a $1.5 million shareholder loan from O'Shea to the company. O'Shea accepted the Amended First Right Offer six days later, on May 17, and agreed to buy Beale's FlightWorks shares at the price set forth therein. Beale, however, refused to

---

[5] The record relating to that part of the case which occurred prior to O'Shea's dismissal of his claims is not part of the record on appeal. In his brief, O'Shea takes issue with Beale's failure to designate at least some portions of the earlier pleadings for inclusion in the appellate record. Despite O'Shea's arguments to the contrary, however, we find that the pleadings, orders, transcripts, and other evidence supplied in the 12 volumes of appellate record contain everything necessary to allow us to review and rule on Beale's two claims of error.

close the transaction after O'Shea tendered what Beale believed to be less than the agreed upon purchase price.[6]

After receiving and accepting Beale's Amended First Right Offer, O'Shea contacted HNB to request confirmation that, upon tender of the purchase price, HNB would release Beale's shares and would also release FlightWorks from any and all obligations on Beale's outstanding loans. In June 2010, after Beale refused to close on the sale of his FlightWorks shares, O'Shea negotiated the purchase of those shares directly from HNB for $3.5 million.[7] As part of that transaction, O'Shea also secured a full release of FlightWorks from its guaranties on Beale's loans. Once he purchased Beale's shares from HNB, O'Shea dismissed his claims against Beale as moot. Beale then filed his amended and restated counterclaims, in which he asserted claims against O'Shea for: (1) fraud, breach of contract, and breach of fiduciary duty, based upon O'Shea's failure to honor the Amended First Right Offer (Counts I, II, and III); (2)

---

[6] The dispute over purchase price arose from the question of whether the $1.5 million loan that O'Shea made to FlightWorks on May 11 could be used to offset the amount due Beale under the Amended First Right Offer. O'Shea took the position that it had to be included in the sale price, which resulted in that price being $750,000 less than Beale contended it should be.

[7] This amount was $365,178.00 more than O'Shea had tendered to Beale for the purchase of those shares and $384,822.00 less than Beale contended he was owed under the Amended First Right Offer.

breach of contract and breach of fiduciary duty based upon O'Shea's alleged withholding of distributions due Beale under the Shareholders Agreement (Counts IV and V); (3) breach of fiduciary duty based on the depression of the sale price of Beale's shares resulting from the Change in Control Agreements (Count VI); (4) breach of fiduciary duty based on O'Shea's purchase of Beale's shares directly from HNB (Count VII); and (5) breach of fiduciary duty based on O'Shea's use of FlightWorks funds to pay his attorney fees and the fees of the special master (Count VIII).

The trial court granted summary judgment to Beale on his claim for breach of contract resulting from O'Shea's failure to honor the Amended First Right Offer (Count II).[8] In that same order, the court also granted summary judgment to O'Shea on all of Beale's remaining claims except Count VI, the claim for breach of fiduciary duty based on O'Shea's execution of the Change in Control Protection Agreements. O'Shea then moved for reconsideration of the denial of summary judgment as to Count VI, arguing that Beale had failed to produce any evidence to establish that he was damaged by the existence of the Change in Control Protection Agreements.

_____

[8] The court subsequently dismissed Beale's claims for fraud (Count I) and breach of fiduciary duty (Count III) resulting from this same conduct, finding that these claims represented alternative theories of recovery.

9

Following a non-evidentiary hearing, the trial court granted O'Shea summary judgment on Count VI.

Beale now appeals from the orders of the trial court granting summary judgment to O'Shea on Count VI, as well as on Beale's claims that O'Shea failed to distribute shareholder profits, in violation of the Shareholder Agreement (Counts IV and V).

1. Beale's claim for breach of fiduciary duty resulting from the Change in Control Protection Agreements is based on his contention that the purpose of those agreements was to make it harder for him to sell his FlightWorks shares to anyone other than O'Shea by reducing the price Beale could receive from third parties.[9] Specifically, Beale argues that these agreements, which required a total payout of $800,000 to Lucey and Lewis at closing if FlightWorks was sold to anyone other than O'Shea, reduced the value of his FlightWorks shares by at least $400,000. The trial court granted summary judgment to O'Shea this claim based on its finding that Beale "failed to establish actual evidence that he suffered damage" as a result of those

_____

[9] According to O'Shea, the purpose of these agreements was to provide incentive for Lucey and Lewis to remain with FlightWorks and thereby provide the company with stability. Both Lucey and Lewis testified that, without the Change in Control Protection Agreements, they would not have remained with the Company.

agreements. On appeal, Beale contends that he presented sufficient admissible evidence to create a jury issue on the question of whether he suffered any such damage. We agree.

To avoid summary judgment, a party is "not required to present evidence of a specific dollar amount of damages." *Pollman v. Swan*, 289 Ga. 767, 768-769 (2) (716 SE2d 191) (2011). Rather, he must only "present evidence sufficient to serve as the basis for a factfinder to calculate the amount of damages due . . . should liability . . . be established." Id. And in cases such as this one, where the damages relate to the value of real or personal property, the question of value is normally regarded as "peculiarly for the determination of the jury." (Citation omitted.) *Varnedoe v. Singleton*, 154 Ga. App. 332 (268 SE2d 387) (1980). Thus, a claim for damages related to value will be submitted to the jury "where there is any data in the evidence upon which the jury may legitimately exercise their own knowledge and ideas. After a witness has given his basis for opinion evidence as to value, it is up to the jury to determine its weight." (Citations omitted.) Id.

Georgia law provides that with respect to damages calculated on the value of property, "testimony as to market value is in the nature of opinion evidence. One need not be an expert or dealer in the article in question but may testify as to its value if he

has had an opportunity for forming a correct opinion." OCGA § 24-9-66. The opportunity for forming an opinion as to value may be established by showing the witness's experience and familiarity with the item being valued. See *Williams v. State*, 246 Ga. App. 347, 352 (2) (540 SE2d 305) (2000) ("An owner does not have to be an expert to testify as to the value of his property (or that property under his control), provided he has experience or familiarity with such values.") (citing OCGA § 24-9-66); *Varnedoe*, 154 Ga. App. at 332 ("[F]or a witness to give his opinion as to value, he must give his reasons for forming that opinion by showing that he had some knowledge, experience, or familiarity as to the value of the item.") (citations omitted). And our case law establishes that a shareholder in a closely-held corporation may testify as to his opinion of the company's worth. *Rental Equip. Group v. MACI*, 263 Ga. App. 155, 159 (1) (d) (587 SE2d 364) (2003); *Southern Cellular Telecom v. Banks*, 208 Ga. App. 286, 287-288 (3) (431 SE2d 115) (1993). Applying these principles to the case at hand, we find that Beale presented sufficient evidence to create a jury question as to whether the Change in Control Protection Agreements caused him any damage.

In support of his motion for summary judgment on this claim, O'Shea relied on the deposition testimony of Clay Westbrook, a principal in Konsortium Capital

12

Partners, the firm that worked to find financing for Holdings' proposed buyout of FlightWorks. He was also the representative of Holdings that executed both the First Right Offer and the amended offer. When asked at his deposition what factors determined the proposed purchase price, Westbrook responded that the price "was determined by the amount of the financing that we were able to procure and the amount of the equity investment that we anticipated we would need." O'Shea argues that this testimony shows unequivocally that the existence of the Change in Control Protection Agreements did not factor into, much less reduce, the offer made by Holdings. This argument, however, ignores other evidence of record, including other testimony offered by Westbrook.

Notably, Westbrook was never asked about the Change in Control Protection Agreements and he never stated that those agreements played no role in calculating the proposed purchase price. Westbrook also testified that he did not determine the purchase price offered by Holdings, but that instead, Beale and Sean Boyd told him what price Holdings would offer. Westbrook further stated that to determine purchase price one would need to examine the company's financial statements, balance sheets, and other information as to the companies assets and liabilities. And, as Beale points out, the need for any buyer other than O'Shea to pay out $800,000 at closing could

13

certainly be considered a liability that would play a role in determining what kind of offer should be made.

Additionally, Sean Boyd submitted an affidavit in which he stated that he was "involved in the calculations with respect to the purchase price offered and the financing" that could be obtained for both offers made by Holdings, and that he was aware of the Change in Control Protection Agreements. Boyd further averred that the Change in Control Protection Agreements were "dilutive in the sense that they were designed to make FlightWorks a less attractive acquisition target and/or required an acquirer to pay a premium for the Company. Any purchaser who or which acquired FlightWorks, would have immediately had a liability to pay out approximately $800,000 to Mr. Lewis and Mr. Lucey." Thus, Boyd concluded that:

> [A]ny reasonable purchaser would have offered to purchase FlightWorks for $800,000 less than it would have in the absence of the "Change in Control Protection Agreements." In my opinion, as a prospective purchaser, the "Change in Control Protection Agreements" devalued FlightWorks by no less than $800,000 and Mr. Beale's stock by no less than $400,000.

Furthermore, through his verified pleadings and interrogatory responses, Beale offered his opinion testimony, as an owner of FlightWorks and as one who sat on the FlightWorks Board for a number of years, that the Change in Control Protection Agreements devalued his shares in the Company by at least $400,000. Taken together, this evidence was sufficient to create a factual issue for the jury as to whether Beale suffered damage as a result of the Change in Control Protection Agreements. See *Dyer v. Honea*, 252 Ga. App. 735, 744 (6) (557 SE2d 20) (2001) (seller of restaurant not entitled to summary judgment based on buyer's alleged inability to prove damages, where buyer "testified that he would not have purchased the restaurant had [seller] informed him of the outstanding liens and that as a result of the purchase, he was forced to borrow funds to keep the restaurant open"); *Williams*, 246 Ga. App. at 352-353 (2) (even "weak" evidence of property's value is sufficient to allow the issue of value to go to the jury); *Southern Cellular Telecom*, 208 Ga. App. at 288 (3). Accordingly, summary judgment on this claim is not appropriate.

2. The Shareholder Agreement required FlightWorks to make annual shareholder distributions in an amount equal to or greater than the estimated tax liability for each shareholder, with such distributions to be made no later than March 15 of each taxable year. In his counterclaim, Beale asserts that O'Shea breached this

15

provision "by using [O'Shea's] illegal control of the board to withhold distributions to Beale," and that the facts underlying this breach of contract claim also constituted a breach of O'Shea's fiduciary duty to Beale.[10] We find no evidence in the record, however, and Beale's brief cites to none, that supports this assertion. The only evidence regarding shareholder distributions came from William Lewis, FlightWorks' CFO. Specifically, Lewis averred that during the 2009 fiscal year, "the estimated tax liability for each shareholder . . . was $433,927.00." During that same fiscal year, according to Lewis, shareholder distributions of $501,610.45 were authorized and made to Beale. Beale received $18,467 in distributions during the first six months of 2009, followed by a lump sum payment of the remaining amount on July 20, 2009. Rather than making the July 20 distribution directly to Beale, however, FlightWorks offset the entire amount against Beale's outstanding loan obligations to the company.[11]

---

[10] In his counterclaim, Beale sets forth O'Shea's election of Lucey and Lewis to, and his removal of Beale from, the Board and thereafter refers to O'Shea's "de facto control of the illegally constituted Board." Beale never alleges that O'Shea illegally controlled the Board or withheld distributions from him prior to July 2009. Thus, given that Beale's claims refer to O'Shea's "illegal control" of the FlightWorks board, they necessarily must reference O'Shea's conduct only after he elected Lucey and Lewis to the Board and then removed Beale therefrom, all of which occurred in 2009.

[11] The record shows that these loans were memorialized by notes that were payable on demand.

We find that this evidence supports the trial court's grant of summary judgment to O'Shea on Counts IV and V of Beale's counterclaim.[12] Although Beale contends the July 2009 distribution did not satisfy the shareholder agreement because it was not paid directly to him, he cites no legal authority to support this argument. Moreover, we agree with the trial court's conclusion that, even if this conduct constituted a breach of contract or breach of fiduciary duty, Beale cannot show that he suffered any damages as a result. As the court below noted, the crediting of the distribution against Beale's outstanding liabilities to FlightWorks benefitted, rather than harmed, Beale.

---

[12] In granting summary judgment on these claims, the trial court also relied on Lewis's testimony that for the period beginning with fiscal year 2005 and ending July 2, 2010, the total taxable income for each shareholder was $1,390,207, and that Beale received distributions totaling $1,798,108 during that same time frame, excluding the July 2010 distribution that was credited against his outstanding loan balances owed FlightWorks. On appeal, Beale contends that this evidence was insufficient to show compliance with the shareholder agreement, because by aggregating distributions for the period between 2005 and 2009 (when the shareholder agreement was in effect), and then dividing those distributions by five, the testimony did not establish that Beale received the appropriate *annual* distributions required by the agreement. Given that Beale's counterclaim is expressly limited to wrongful withholding only after O'Shea obtained "illegal" control of the Board – i.e., after July, 2009 – we need not consider distributions made prior to July 2009. See *Duncan v. Klein*, 313 Ga. App. 15, 21 (3) (720 SE2d 341) (2011) ("On an appeal from the award of summary judgment, however, we are not confined to the reason given by the trial court for its decision, and we can affirm the decision below if it is right for any reason.") (citation omitted).

17

For the reasons set forth above we reverse the trial court's order of October 12, 2011, granting summary judgment to O'Shea on Beale's claim for breach of fiduciary duty resulting from the Change in Control Protection Agreements. We affirm, however, the trial court's order of September 16, 2011, granting summary judgment to O'Shea on Counts IV and V of Beale's counterclaim.

*Judgment affirmed in part; reversed in part. Miller, P. J., and Ray, J., concur.*