**SECOND DIVISION**
**ANDREWS, P. J.,**
**MILLER and BRANCH, JJ.**

NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**July 15, 2015**

# In the Court of Appeals of Georgia

A15A0598. QENKOR CONSTRUCTION, INC. v. EVERETT.

BRANCH, Judge.

Qenkor Construction, Inc. ("QCI") sued John Everett, the former sheriff of Chattooga County, alleging that Everett's conduct in executing a search warrant resulted in trespass against and the conversion of certain property belonging to QCI. Everett moved for summary judgment, asserting that QCI's claims against him were barred by official immunity. Everett further argued that QCI could not prevail on its claims for trespass and conversion because, regardless of whether he was entitled to immunity, his conduct was otherwise authorized by law. The trial court granted Everett's motion in a one-sentence order that contained no findings of fact or

conclusions of law. QCI now appeals from that order.[1] For reasons explained below, we find that Everett is entitled to official immunity for the conduct that serves as the basis for QCI's trespass claim, and we therefore affirm the grant of summary judgment on that claim. We reverse the grant of summary judgment on QCI's claim for conversion, however, because we find that questions of fact exist as to whether Everett converted QCI's property and, if so, whether he acted with actual malice in doing so.

Summary judgment is proper if the pleadings and evidence "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." OCGA § 9-11-56 (c). We review a trial court's ruling on summary judgment de novo, "viewing the evidence in the record, as well as any inferences that might reasonably be drawn from that evidence, in the light most favorable to the nonmoving party," *Beale v. O'Shea*, 319 Ga. App. 1, 2 (735 SE2d 29) (2012) (citation and punctuation omitted), and bearing in mind that the "trial court is not authorized to resolve disputed issues of material fact." *Ly v. Jimmy Carter Commons, LLC*, 286 Ga. 831, 833 (1) (691 SE2d 852) (2010) (citation omitted).

---

[1] Because the trial court offered no insight into the bases for its grant of Everett's summary judgment motion, QCI argues on appeal that neither of the grounds asserted in that motion support the trial court's order.

2

Viewed in the light most favorable to QCI, as the non-movant, the record shows that QCI is a construction company and William Benefield served as its sole officer and shareholder. Benefield's mother, Sandra Weaver, served as QCI's accountant, and in that capacity she had access to QCI's bank accounts. Weaver was also QCI's landlord. Specifically, the record shows that Weaver owned a company called North Georgia Computerized Services ("NGCS") which offered computer repair, as well as word processing, desktop publishing, and tax preparation and other business-related services. NGCS's offices were housed in a building owned by Weaver and listed on the Chattooga County tax records as being located at 11195 Highway 27, Summerville. When QCI began operation in August 2009, Benefield divided this building into two interior halves by placing a wall with a locked door in the middle of the structure. Each side of the building had its own entrance, and QCI and NGCS maintained signage advertising their respective businesses on their respective sides of the building. Additionally, QCI placed a mailbox on its side of the building with the street number 11193, and QCI listed its address as 11193 Highway 27, Summerville. There is no evidence in the record showing how QCI came up with the address 11193, nor does the record show that any governmental entity viewed the

3

building as being on two separate lots. Instead, it appears that 11193 was not considered an address for property tax purposes.

Although QCI provided a variety of home improvement services, its primary business was roof repair and replacement. QCI advertised its roofing services by offering customers a "free roof" if their current roof had been damaged by hail. When providing prospective customers with a damage assessment and repair estimate, QCI sales representatives would ask the customer to sign a contract known as a "subject to" agreement. Under the terms of this form contract, QCI would inspect the roof and report any damage to the homeowner's insurer. The contract would become binding only if the insurer deemed the roof repair or replacement to be a covered loss under the homeowner's policy. In that case, the customer would then be liable under the contract for any insurance deductible. Additionally, each of these contracts contained a liquidated damages clause, which provided that if, after the insurance company agreed to pay for the roof repair or replacement, the customer elected to use another company for those services, QCI would be entitled to 25 percent of the contract price as liquidated damages.

In the event a particular customer failed to pay any amount owed as a result of either his deductible or the liquidated damages clause, QCI would file a construction

4

lien against the customer's property. All liens filed by QCI were signed by Benefield and bore the notary seal and signature stamp of Sue Brown. In approximately late 2009 or early 2010, both the Chattooga County Sheriff's Office and the State Insurance Commissioner's Office received several complaints about QCI's filing of construction liens. Specifically, customers were complaining that they had signed a form believing they were authorizing QCI to go on their roof and provide them with an estimate and then discovered that a construction lien had been filed by QCI, even though the company had done no work on the property. Everett, who at the time was serving as the Chattooga County Sheriff, contacted the Insurance Commissioner's office about these complaints. As a result, investigator Doug Gaddis of the Insurance Commissioner's office opened an investigation into QCI.

During the course of Gaddis's investigation, he learned that Sue Brown had not, in fact, ever witnessed or notarized any of the QCI construction liens on which her notary seal and signature stamp appeared, a fact that both Benefield and Weaver eventually confirmed. Brown told investigators that she had worked for Weaver at NGCS from 2001 through 2008 and for several weeks during 2009. When Brown left Weaver's employment, she left her signature stamp and notary seal with Weaver.

5

As a result of his investigation, Gaddis applied to the Chattooga County Magistrate Court for a search warrant for the building owned by Weaver and which housed the offices of both NGCS and QCI. The affidavit Gaddis submitted in support of the search warrant set forth facts learned during the investigation into QCI's filing of construction liens. The affidavit further stated that as a result of QCI's conduct with respect to the filing of construction liens, state investigators had reason to believe that Benefield and Weaver were engaged in the crimes of forgery and making false statements; that investigators were seeking additional evidence of such crimes, in the form of certain business, employment, and financial records, computers, computer systems, computer hardware, software, and data, and other computer-related equipment, notary stamps, notary seals, and signature stamps; and that investigators had reason to believe such evidence could be found inside a building located at 11195 Highway 27, Summerville.

> The search warrant was issued and it described the premises to be searched as:
> 11195 Highway 27, Summerville, GA 30747
> Listed with the Board of Assessors for Chattooga County as North Georgia Computerized Services, owned by Sandra Weaver. Commercial Building located across Highway from McDonald's restaurant and described as: a single level building with rock appearance half way up

6

front and gray vinyl siding top front with gray shingle roof, bearing signs in window reading "Tax Service."

Additionally, the warrant allowed police to search for and seize the items specified in the affidavit to the extent that such items could include evidence of forgery and the making of false statements.

At approximately 10:00 a.m. on April 21, 2010, officers with the Chattooga County Sheriff's Office conducted a traffic stop of a car in which Weaver and Benefield were riding and arrested Benefield pursuant to a warrant. Officers then followed Weaver as she drove to the building that housed both the NGCS and QCI offices. At the direction of Everett and/or other officers with the Chattooga County Sheriff's Department, Weaver unlocked the outside entrance to the QCI office and Everett, Gaddis, additional officers with the Chattooga County Sheriff's Department, and investigators with the Insurance Commissioner's office executed the search warrant. The entire building was searched, including the offices of both QCI and NGCS.[2] After Gaddis told one or more officers that Weaver was not under arrest, she was allowed to leave the scene. Weaver went to the bank where she withdrew

[2] At the same time, other officers also executed search warrants that had been issued for the homes of both Benefield and Weaver.

7

$13,000 cash from QCI's account, intending to use that money to post bond and retain an attorney for Benefield.

As Weaver drove back by the NGCS/QCI building following her trip to the bank, officers flagged her down to ask about keys to the filing cabinets in the NGCS office. Weaver pulled into the parking lot of a car wash situated behind her building, and spoke with officers while sitting on a stone wall that divided the two properties. Officers went on to the car wash property and searched Weaver's car, in which they found her pocketbook and the $13,000 cash it contained.[3] During a discussion with Kandy Dodd, an investigator with the Sheriff's Department, Weaver stated that she was the person who had notarized the construction liens filed by QCI, using the notary seal and signature stamp of Sue Brown. Dodd reported this information to Gaddis, and Gaddis and Everett then interviewed Weaver in the NGCS office. During that interview, Everett announced that he was seizing the $13,000 cash found in Weaver's pocketbook as evidence. According to Weaver, Everett stated that he was seizing the cash because the QCI bank account should have been frozen. Weaver also testified that her understanding from one of the Insurance Commissioner's

---

[3] According to Weaver, her car was searched four times on the day in question: twice while it was parked at her building; once at her home; and once while it was parked at the car wash located adjacent to her building.

investigators was that they were refusing to seize the cash because it was not covered by the warrant.

At some point either during or after her interview with Everett and Gaddis, Weaver was arrested. There is conflicting testimony as to whether the cash was seized before or after Weaver was placed under arrest. The undisputed evidence shows, however, that QCI's bank accounts were never frozen.

Weaver began calling Everett, who is also her first cousin, in September or October of 2010 seeking the return of the property taken during the execution of the search warrant, especially NGCS's computer equipment and QCI's cash. Everett told Weaver that he did not have any of the seized property, including QCI's cash, because it had all been taken by the Insurance Commissioner's office and was in Atlanta. When Weaver contacted Gaddis, however, Gaddis told her that the Sheriff had all of the seized property. Weaver again contacted Everett, who again insisted that he did not have any of the seized property, including the cash. In early November 2010, Weaver called Gaddis a second time about the return of the property at issue, including QCI's cash. Gaddis advised Weaver to contact the office of the Chattooga County District Attorney. Weaver did so and on approximately December 21 or 22, Gaddis called her and told her the seized property could be picked up at the Sheriff's

9

office. Benefield went and retrieved the items, but the cash was not among the property returned. Weaver again contacted the District Attorney's office, which then sent a letter to Everett instructing him to return QCI's cash. Everett returned the money in either late December 2010 or early January 2011.

In November 2011, Benefield and Weaver were each indicted on 46 counts of forgery in the first degree and nine counts of making a false statement. The charges against Benefield were nolle prossed on August 16, 2012, and the charges against Weaver were nolle prossed one year later, on August 19, 2013.

1. QCI seeks to hold Everett liable for conduct he engaged in while performing his duties as Chattooga County Sheriff. Given this fact, we begin with the question of whether Everett is entitled to immunity from QCI's claims.[4]

---

[4] QCI has sued Everett only in his personal capacity and therefore sovereign immunity is not at issue in this case. See *Seay v. Cleveland*, 270 Ga. 64, 65 (1), n. 1 (508 SE2d 159) (1998) (a sheriff sued in his personal capacity will be protected "only to the extent official or qualified immunity applies"; sovereign immunity is applicable only where a sheriff is sued in his official capacity). And because he has not been sued in his official capacity, Everett may be held liable only for conduct that he personally engaged in. Id. See also *Gilbert v. Richardson*, 264 Ga. 744, 754 (452 S.E.2d 476) (1994) (a sheriff may be held liable under the doctrine of respondeat superior for the conduct of his officers only where the sheriff has been sued in his official capacity).

"As a general rule, a county law enforcement officer enjoys official immunity from a lawsuit alleging that she is personally liable in tort for her performance of official functions." *Eshleman v. Key*, ___ Ga. ___ (1) (Case No. S14G1173, decided June 29, 2015) (citations and footnote omitted). Such immunity is abrogated, however, in two specific circumstances. First, no immunity exists where the officer acted "with malice or an intent to injure." *Cameron v. Lang*, 274 Ga. 122, 123 (1) (549 SE2d 341) (2001) (footnote omitted). Second, an officer is without immunity for the negligent performance of a purely ministerial duty. Id. The Supreme Court of Georgia has explained the difference between the ministerial functions of a law enforcement officer and official functions that involve the officer's exercise of discretion as follows:

> A ministerial act is commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty. A discretionary act, however, calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed. Whether the act of a public official is ministerial or discretionary is determined by the facts of each individual case, particularly the facts specifically relevant to the official's act or omission from which the alleged liability arises.

11

*Grammens v. Dollar*, 287 Ga. 618, 619-620 (697 SE2d 775) (2010) (citations and punctuation omitted). "A ministerial duty may be established by evidence such as a written policy, an unwritten policy, a supervisor's specific directive, or a statute. Procedures or instructions adequate to cause an act to become merely ministerial must be so clear, definite and certain as merely to require the execution of a relatively simple, specific duty." *Roper v. Greenway*, 294 Ga. 112, 115 (751 SE2d 351) (2013) (citations and punctuation omitted).

Bearing these principles in mind, we turn to the question of whether the trial court properly granted summary judgment to Everett on QCI's claims for trespass and conversion.

2. Under Georgia law, all citizens are afforded "an absolute right of enjoyment of their property, and 'every act of another which unlawfully interferes with such enjoyment is a tort for which an action shall lie.' OCGA § 51-9-1." *Nichols v. Ga. Television Co.*, 250 Ga. App. 789, 790 (1) (552 SE2d 550) (2001). The conduct which serves as the basis for QCI's trespass claim is the execution of the search warrant. At the time the warrant was executed, the Chattooga County Sheriff's Department had in place a written policy concerning the execution of search warrants. That written policy provided, in relevant part:

> Prior to the execution of a search warrant, an officer of supervisory rank shall have reviewed the affidavit and warrant and the circumstances of its issuance to ensure the requirements of the law are being met, and that all necessary elements are present, even though the warrant may have already been signed by the appropriate authority.

In this case, Everett admitted that he did not review the warrant prior to its execution. QCI contends that this failure to review the warrant constitutes a breach of a ministerial duty that resulted in the trespass to QCI's property. Specifically, QCI asserts that had Everett fulfilled his ministerial duty to review the search warrant, he would have seen that the warrant was only for 11195 Highway 27 and therefore did not cover QCI's offices, which were ostensibly located at 11193 Highway 27. And because Everett negligently failed to perform this ministerial duty, QCI argues, he is not entitled to immunity for his conduct. This argument fails for two reasons.

First, the undisputed evidence shows that the written policy in question applied only to those search warrants that were procured by officers with the Chattooga County Sheriff's Office. Both Everett and Mark Schrader, the current Chattooga County Sheriff, testified that the policy did not apply to warrants that were procured by other state agencies, including the Insurance Commissioner's office. Each of these men also testified that the policy did not require the Chattooga County Sheriff's

13

Department to review such warrants even where its officers were being used to assist in the execution of the same. This testimony, which is unrefuted, shows that the decision whether to review a search warrant procured by another state agency remained entirely within the discretion of the Chattooga County Sheriff and/or any other supervising officer. Thus, Everett's decision not to review the search warrant at issue is protected by official immunity.[5]

QCI's argument also fails because it is premised on an erroneous assumption – i.e., it assumes that the warrant in question did not allow the search of its offices. "The requirement that a search warrant particularly describe the place to be searched is fulfilled if the warrant contains a description that sufficiently permits a prudent officer executing the warrant to locate the premises, person or property to be searched definitely and with reasonable certainty, and without depending upon his discretion." *State v. Hicks*, 269 Ga. App. 741, 742-743 (605 SE2d 34) (2004) (citation and punctuation omitted). The degree of specificity required in a warrant "is flexible and will vary with the circumstances involved." *Fair v. State*, 284 Ga. 165, 170 (3) (a) (664 SE2d 227) (2008) (citation and punctuation omitted). In evaluating whether a

---

[5] There is no allegation that Everett acted with actual malice in failing to review the search warrant.

14

particular warrant sufficiently described the location to be searched, we read the warrant as a whole and consider it in conjunction with other evidence. *Hicks*, 269 Ga. App. at 743. Such evidence includes the supporting affidavit and whether one or more of the executing officers was familiar with the location to be searched and was therefore not dependent solely upon the warrant's description to find the property. See *Anderson v. State*, 249 Ga. 132, 135-136 (5) (287 SE2d 195) (1982).

The search warrant at issue was for a building "*[l]isted with the Board of Assessors of Chattooga County*" as being located at 11195 Highway 27, Summerville; as being "[NGCS], owned by Sandra Weaver"; as being a "[c]ommercial building located across Highway [27] from McDonald's restaurant and described as: a single level building with rock appearance halfway up front and gray vinyl siding top front with gray shingle roof, bearing signs in the window reading 'Tax Service.'" (Emphasis supplied.) The record shows that QCI's offices were, in fact, located in the building described in the warrant. Accordingly, even though the building had been partitioned and QCI had begun using an address that was not listed in the county tax records, the search warrant allowed police to search QCI's offices.

A search warrant for a multi-unit structure will be valid, even if it fails to specify the particular sub-unit to be searched, "where (1) there is probable cause to

search each unit; (2) the targets of the investigation have access to the entire structure; or (3) the officers reasonably believed that the premises had only a single unit." *Fletcher v. State*, 284 Ga. 653, 655 (3) (670 SE2d 411) (2008) (punctuation and footnote omitted). Although the warrant will be considered valid under any one of these scenarios, in this case all three circumstances were present. First, the warrant allowed police to search and seize the customer files and financial records, including the bank and payroll records, of QCI. Weaver had access to QCI's bank accounts and served as the company's accountant and may have been providing those services through NGCS. Thus, as the affidavit in support of the warrant reflects, there was probable cause to believe that the evidence sought could be found in either the QCI offices or the NGCS offices. Additionally, Weaver, who was one of the targets of the investigation, had access to the entire structure, as evidenced by the fact that she had keys to both the interior and exterior doors used to access QCI's space. Finally, despite QCI's use of the 11193 address, law enforcement had a reasonable belief that the building at issue was in fact a single unit. In this regard, the record shows that Weaver had owned the building since 1995; that until approximately August 2009 (less than one year before the search), the building had been a single unit; that in 2009 interior modifications were made that divided the building into two units; that Weaver

16

never informed the tax assessor's office of the change in her building; that although QCI had installed a mailbox on its side of the building, had placed the address 11193 on the mailbox, and began using 11193 as its business address, 11193 was never recognized as an address for tax assessment purposes; that no evidence shows that the 11193 street address existed prior to August 2009; and that both the building and the lot on which it was situated were listed in the relevant public records as having the address 11195.

In light of the foregoing, we find that the warrant authorized the police to search the entire building in which QCI's offices were located, including the space occupied by QCI. See *U. S. v. Bradley*, 644 F3d 1213, 1266 (III) (A) (1) (d) (11th Cir. 2011) (although the warrant referred to the building as bearing the name of a specific company (Seratech) "the warrant's invocation of Seratech merely described the building to be searched. It did not restrict the agents' search to the premises known as or controlled by Seratech. Instead, the warrant permitted the search of the *entire building* so long as the agents reasonably believed they would find '[i]tems to be seized' [under the warrant] in the location of their search.") (Emphasis in original.) Thus, Everett's conduct in executing the warrant cannot support a claim for trespass, and the trial court did not err in granting summary judgment to Everett on this claim.

17

3. We next address whether the trial court erred in granting summary judgment against QCI on its claim for conversion.[6] Under Georgia law, both cash and checks may be the subject of a conversion claim and conversion is defined as

> "an unauthorized assumption and exercise of the right of ownership over personal property belonging to another, in hostility to his rights; an act of dominion over the personal property of another inconsistent with his rights; or an unauthorized appropriation. Any distinct act of dominion wrongfully asserted over another's property in denial of his right, or inconsistent with it, is a conversion."

*Decatur Auto Center v. Wachovia Bank, N.A.*, 276 Ga. 817, 819 (583 SE2d 6) (2003) (punctuation and footnote omitted), quoting *Maryland Cas. Ins. Co. v. Welchel*, 257 Ga. 259, 261 (1) (356 SE2d 877) (1987). In this case, QCI argues that Everett converted the $13,000 cash belonging to QCI and which he seized from Weaver and subsequently refused to return for approximately nine months.

---

[6] We note that Everett cannot be held liable for the conversion of QCI's computers, business records, and other business property. For the reasons explained in Division 2, the seizure of those items was justified under the search warrant. Thus, to the extent that QCI asserted a conversion claim as to those items, we affirm the grant of summary judgment to Everett. Our discussion in Division 3 relates only to QCI's claim for the alleged conversion of its cash.

18

On appeal, Everett offers four arguments to support the grant of summary judgment in his favor on QCI's conversion claim. Specifically, Everett argues that his seizure of the cash was authorized by the search warrant; that his seizure of the cash was authorized by law; that he did not unlawfully retain QCI's funds; and that in seizing and retaining the cash, he was exercising his discretionary authority and therefore his conduct is protected by official immunity.

(a) Despite Everett's arguments to the contrary, the search warrant did not authorize his seizure of the cash — a fact that Everett admitted at his deposition. As an initial matter, the cash was not discovered as the result of the search warrant's execution. Rather, police discovered the money during a warrantless search of Weaver's car and pocketbook. And at the time of the discovery, neither the car nor the purse was on the premises covered by the warrant.

Moreover, even if we assume the warrant somehow authorized the search of Weaver's car and purse, the warrant did not authorize police to seize any cash they located during the execution of the warrant. The law requires that warrants describe with particularity the items to be seized and as a general rule, an officer may not seize anything not specified in the warrant. See *State v. Rogers*, 319 Ga. App. 834, 836 (2) (738 SE2d 667) (2013) (a "warrant shall particularly describe the things to be seized

19

and the search must be limited to that matter described") (footnote omitted). Courts have recognized only two exceptions to this rule. First, where the warrant contains a residual clause allowing officers to seize "other evidence" of specifically enumerated crimes, officers may seize any such evidence discovered during the warrant's execution. See *Reaves v. State*, 284 Ga. 181, 185-186 (2) (d) (664 SE2d 211) (2008). Similarly, even in the absence of a residual clause, "an officer in the process of executing a lawful search warrant is authorized under OCGA § 17-5-21 (b) to seize any item, other than private papers, which he has probable cause to consider tangible evidence of the commission of a crime, even though the property is not listed in the warrant[,]" provided "that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be seen and that the incriminating character of the evidence was immediately apparent." *Bryant v. State*, 304 Ga. App. 456, 460-461 (2) (696 SE2d 439) (2010) (citations, punctuation and footnotes omitted).

In this case, the warrant did not authorize the seizure of cash or checks. Furthermore, the warrant contained no residual clause and it authorized the police to search only for evidence of the crimes of forgery and making false statements in conjunction with the filing of construction liens. Such liens, in turn, were filed against

only those customers who had failed to pay QCI amounts QCI claimed it was owed. As a matter of logic, cash in QCI's possession could not serve as evidence in cases involving customers who had refused to pay QCI. Accordingly, the cash was not subject to seizure under the search warrant.

(b) Everett further argues that even if not authorized by the search warrant, the seizure of the cash was proper as part of a police inventory incident to Weaver's arrest and/or that it was authorized by OCGA § 17-5-28.[7] These arguments are without merit.[8]

(i) Under OCGA § 17-5-1,"[w]hen a lawful arrest is effected a peace officer may reasonably search the person arrested and the area within the person's immediate

---

[7] OCGA § 17-5-28 provides: "In the execution of the search warrant the officer executing the same may reasonably detain or search any person in the place at the time: (1) To protect himself from attack; or (2) To prevent the disposal or concealment of any instruments, articles, or things particularly described in the search warrant."

[8] Everett also argues that because QCI had no possessory or privacy interest in Weaver's purse, the company is without standing to challenge the seizure of the cash from Weaver. This argument would be relevant if Benefield (as QCI's sole officer and shareholder) was challenging the State's use of the cash and its discovery as evidence of Benefield's guilt in a criminal action against him. See, e.g., *Jones v. State*, 320 Ga. App. 681, 685-686 (2) (740 SE2d 655) (2013). Benefield's standing to challenge the admissibility of such evidence in a criminal prosecution, however, is wholly irrelevant to QCI's claim for conversion of its cash.

21

presence." In this case, however, there is conflicting evidence as to whether the cash was seized before or after Weaver's arrest. Accordingly, Everett is not entitled to summary judgment on the grounds that his seizure of the money was authorized under OCGA § 17-5-1, as part of an inventory search pursuant to Weaver's arrest.

(ii) Nor was the seizure of QCI's money authorized by OCGA § 17-5-28, which allows police, under certain circumstances, "to detain or search any person" who is present on the premises during the execution of a search warrant. Even assuming that the discovery of the cash resulted from a search of Weaver conducted pursuant to this code section, the fact remains that the cash was not subject to seizure, as it was not among the items "particularly described in the search warrant." OCGA § 17-5-28 (2).

(c) Everett further argues that QCI's conversion claim must fail because he did not wrongfully retain QCI's money. Specifically, Everett argues that OCGA § 17-5-

22

54 (d) (1)[9] and 17-5-55 (a)[10] allowed him to retain the cash until the disposition of any charges brought against either Benefield or Weaver. This argument, however, ignores the fact that the cash was not lawfully seized pursuant to the search warrant. The argument further assumes that the cash could or would be used as evidence against Benefield and/or Weaver on the charges of forgery and the making of false statements in connection with the filing of construction liens. As explained supra in Division 3 (a), however, the cash would not be relevant to Benefield's or Weaver's guilt as to those crimes. Finally, Everett's argument on this issue ignores the fact that he refused to return the cash for approximately two months after the investigating entity (the

---

[9] This Code section provides, in relevant part, that "[a]fter a period of 90 days following the final verdict and judgment, when personal property that is in the custody of a law enforcement agency was used as evidence in a criminal trial. . . it shall be subject to disposition as provided in subsection (e) of this Code section . . . if it is . . . [n]o longer needed in a criminal investigation or for evidentiary purposes in accordance with Code Section 17-5-55 or 17-5-56." OCGA § 17-5-54 (d) (1).

[10] This Code section provides, in relevant part, that "[a]fter verdict and judgment has been entered in any criminal case, the person who has custody of the physical evidence introduced in the case shall inventory the evidence and create an evidence log within 30 days of the entry of the judgment. Within 30 days following the creation of the evidence log, physical evidence shall be returned to the rightful owner of the property unless the physical evidence itself is necessary for the appeal of the case, for a new trial, or for purposes of complying with this Code section or Code Section 17-5-56." OCGA § 17-5-55 (a).

Insurance Commissioner's office) and the district attorney's office had directed him to do so.

(d) We agree with Everett's assertion that he seized and retained the cash while acting within the scope of his official duties as sheriff and that these acts were discretionary in nature. Thus, qualified immunity will shield Everett from liability on QCI's conversion claim unless QCI can show that Everett acted "with actual malice or with actual intent to cause injury." Ga. Const. 1983, Art. I, Sec. II, Par. IX (d). See also *Phillips v. Hanse*, 281 Ga. 133, 134-136 (2) (637 SE2d 11) (2006). In this context, actual malice means

> "express malice," i.e., "a deliberate intention to do wrong," and does not include "implied malice," i.e., the reckless disregard for the rights or safety of others. *Merrow v. Hawkins*, 266 Ga. 390, 391-392 [2] (467 SE2d 336) (1996). A "deliberate intention to do wrong" such as to constitute the actual malice necessary to overcome official immunity must be the intent to cause the harm suffered by the plaintiffs.

*Murphy v. Bajjani*, 282 Ga. 197, 203 (4) (647 SE2d 54) (2007).

Here, we find a jury question exists as to whether Everett acted with actual malice in allegedly converting QCI's money. Evidence from which the jury could infer such malice includes the fact that seizure of the funds was not authorized by the

24

search warrant and that Everett acknowledged this fact at his deposition; that an investigator with the insurance commissioner's office warned Everett against seizing the money for that reason; that despite the fact he took possession of the money, Everett insisted to Weaver that the money was located at the Insurance Commissioner's office in Atlanta; that even after being directed by the district attorney's office to return the property seized pursuant to the search warrant, Everett refused to return the cash; and that Everett returned the money only after being directed to do so a second time by the district attorney, with the district attorney having to put this instruction in writing. Additionally, there is some evidence showing that Everett may have had some personal animosity towards Weaver and/or Benefield as a result of strained family relations caused by Everett's execution of the search warrant against his cousins.

As the foregoing discussion demonstrates, the evidence shows genuine issues of material fact as to whether Everett's conduct constituted conversion and, if so, whether Everett acted with actual malice. The trial court therefore erred in granting summary judgment to Everett on QCI's claim for the conversion of its cash.

For the reasons set forth above, we affirm the trial court's grant of summary judgment in favor of Everett on QCI's claim for trespass, as well as any conversion

25

claim based upon Everett's seizure of items named in the search warrant at issue. We reverse the grant of summary judgment to Everett on QCI's claim for conversion of its cash. The case is remanded for proceedings consistent with this opinion.

*Judgment affirmed in part and reversed in part. Andrews, P. J., and Miller, J., concur.*