**THIRD DIVISION
ELLINGTON, P. J.,
ANDREWS and RICKMAN, JJ.**

**NOTICE: Motions for reconsideration must be**
*physically received* **in our clerk's office within ten days
of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**June 27, 2017**

# In the Court of Appeals of Georgia

A17A0303, A17A0539. ALPHA BALANCED FUND, LLLP v.
    IRONGATE PERFORMANCE FUND, LLC et al.; and vice
    versa.

RICKMAN, Judge.

After Alpha Balanced Fund, LLLP (an investor ) requested a full withdrawal/redemption of its balance in the hedge fund Irongate Performance Fund, LLC ("the Fund") and waited the requisite time period for its right to its investment balance to purportedly vest, Irongate DPS, LLC ("the Fund Manager"[1] ) suspended all Fund withdrawal requests indefinitely and terminated the Fund five months later, consequently depriving Alpha of its purportedly vested Fund balance. Alpha sued the Fund and the Fund Manager (collectively "Irongate"), alleging claims for breach of

---

[1] Irongate DPS, LLC is also a member of the Fund, and is the Fund's general partner.

contract, breach of fiduciary duty, conversion, and unjust enrichment.[2] As of the last hearing in the trial court, the Fund was still in the process of winding-up and more than $4 million had thus far been dispersed in cash distributions to all Fund members/investors, including Alpha, which had received $430,000 of its purportedly vested Fund balance of $1,008,229.78.[3] The gravamen of Alpha's complaint was that since it had submitted a withdrawal request before the decision was made to suspend all withdrawal requests, and its right to withdraw had vested, it should have been, but was not, treated as a creditor of the Fund and given priority (i.e., paid first) over other Fund members/investors; instead, Alpha asserts, it was "forced" to share in Fund losses that diminished its investment balance in the Fund.

---

[2] Alpha also sought a declaratory judgment, but the trial court dismissed that claim. That ruling is not being appealed herein.

[3] Alpha invested a total of $2,700,000 in Irongate between February 2007 and September 2008. In September 2008, immediately prior to investing an additional $1,000,000, Alpha's capital account had already lost approximately $800,000 of the $1,700,000 that it had originally invested.

The trial court granted Irongate's motion for summary judgment[4] and denied Alpha's cross motion for partial summary judgment.[5] In Case No. A17A0303, Alpha appeals the summary judgment rulings. In Case No. A17A0539, Irongate appeals the trial court's denial of its motion to dismiss Alpha's appeal/Case No. A17A0303. For the reasons that follow, we affirm in both cases.

*Case No. A17A0539*

In Case No. A17A0539, Irongate appeals the trial court's denial of its motion to dismiss Alpha's appeal in the underlying action, Case No. A17A0303. The material facts are undisputed. On October 26, 2015, Alpha timely filed a notice of appeal from the trial court's summary judgment rulings, and said notice of appeal included direction to the trial court clerk that "No portion of the record shall be omitted from the record on appeal," and a notice that "A transcript of evidence and proceedings WILL be transmitted as part of the record on appeal."[6]

---

[4] Irongate moved for summary judgment on all of Alpha's pending claims (breach of contract, breach of fiduciary duty, conversion, and unjust enrichment).

[5] Alpha moved for partial summary judgment on its claims for breach of contract and conversion.

[6] (Emphasis in original.)

3

Pursuant to OCGA § 5-6-42, absent the grant of an extension of time, it was Alpha's responsibility to "cause [the motions for summary judgment transcript] to be filed within 30 days after filing of the notice of appeal[,]" or risk possible dismissal of the appeal. See *In the Interest of D. M. C.*, 232 Ga. App. 466, 467 (2) (b) (501 SE2d 305) (1998).[7] Although the transcript should have been filed by November 25, 2015, it was filed on August 18, 2016, about nine months late, and the appeal was thus docketed on September 15, 2016, almost one year after the notice of appeal was filed. Notably, it was in April 2016 (six months from when the notice of appeal was filed), however, that Alpha discovered that the transcript had not been filed; Alpha was alerted to the problem after Irongate filed a motion to dismiss on the ground that the transcript had not been filed. Apparently, Alpha attempted to have the transcript filed in April 2016, but Irongate objected, and the court reporter was prohibited from filing the transcript until the matter was resolved. In August 2016, a hearing was held on the matter.

---

[7] See also *Holy Fellowship &c. in Christ v. First Community Bank of Henry County*, 242 Ga. App. 400, 402 (530 SE2d 24) (2000) ("Without question, it is an appellant's obligation to complete the record. In so doing, an appellant must timely pay the costs and ensure the timely preparation of any needed transcripts or evidence.") (citations and punctuation omitted); OCGA § 5-6-48 (c).

At the hearing, Irongate argued that Alpha's appeal should be dismissed due to Alpha's failure to ensure that transcripts were timely filed in the trial court. But the trial court issued an order denying Irongate's motion, and finding that the delay in filing the transcript was excusable and was not caused by Alpha.

If a trial court finds that the delay in filing a transcript was: "(1) unreasonable; (2) inexcusable; and (3) caused by appellant, it can dismiss the notice of appeal." (Citations omitted.) *In the Interest of D. M. C.*, 232 Ga. App. at 467 (2) (b); OCGA § 5-6-48 (c). "The trial court has discretion in passing on these questions, [and] that discretion is subject to appellate review for abuse."(Citation omitted.) *Atlanta Orthopedic Surgeons v. Adams*, 254 Ga. App. 532, 535 (562 SE2d 818) (2002).[8] "The court must find *all* these conditions before an exercise of discretion is authorized." (Citation and punctuation omitted; emphasis supplied.) *In the Interest of D. M. C.*, 232 Ga. App. at 468 (2) (b); *Hall v. Bussey*, 200 Ga. App. 311 (408 SE2d 430) (1991).[9]

---

[8] See *Jackson v. Beech Aircraft Corp.*, 213 Ga. App. 172, 173 (444 SE2d 359) (1994) ("Determination of relevant factual issues rests in the sound discretion of the trial court. Thus, the cause of delay in the processing of an appeal is a fact issue for trial court determination and, in making that determination, the trial court exercises a broad legal discretion subject to appellate review only for abuse.") (citations omitted).

[9] See, e.g., *Pistacchio v. Frasso*, 309 Ga. App. 583-584 (711 SE2d 98) (2011) (trial court's dismissal of appeal was vacated and case remanded for findings as to whether the delay in filing transcript was unreasonable; held, "In the absence of this

Here, the trial court's findings that the delay in filing the transcript was excusable and was not caused by Alpha are supported by the record. The record reflects that before Alpha filed its timely notice of appeal, Alpha asked the court reporter to prepare the summary judgment hearing transcript, and to file it with the clerk of court and send Alpha a copy; Alpha paid the court reporter for a copy of the transcript; and Alpha received an emailed copy of the transcript from the court reporter. And well within 30 days after filing its notice of appeal, Alpha paid invoices from the clerk of court, for appeal costs. Alpha's counsel stated that he had had cases in the trial court's judicial circuit "that have taken two months, six months . . . for the record to get transmitted after the transcript has been filed," and he had had cases "that took over a year for the record from the notice of appeal being filed until it is docketed at the Court of Appeals." Consequently, according to counsel, he had no reason to suspect any problem with the transcript until Irongate filed a motion to dismiss the appeal about six months after the notice of appeal was filed.

The court reporter testified that she had received Alpha's written request to file the transcript with the clerk; that she thought that she had filed the transcript on the 8th

---

finding, the trial court had no discretion to dismiss the appeal, and we are unable to review the exercise of its discretion.") (citations omitted).

6

or 9th of October 2015; that the e-filing system was "very new," and that "[t]his may have been the first or one of the very first transcripts that I filed through e-filing"; and that when this matter was brought to her attention and she started looking into it, she realized that the transcript had not been filed and instead "had gone to the draft folder." The court reporter also testified that she did not recall whether she had communicated to Alpha either that she would file the transcript, or that she had in fact filed the transcript; and she affirmed that the error could be corrected "in a matter of minutes." It is, in part, based on this latter testimony that Irongate argues that Alpha caused the delay in filing the transcript.

True, "[t]he statutory duty to file timely a transcript does not rest with the court reporter." (Citation and punctuation omitted.) *In the Interest of D. M. C.*, 232 Ga. App. at 468 (2) (b). But it is also likewise true that pursuant to OCGA § 5-6-48 (f), "the failure of a court reporter to [timely] file the transcript will not constitute cause for dismissal 'unless it affirmatively appears from the record that the failure was caused by the appellant.'" (Citation and punctuation omitted.) *Welch v. Welch*, 212 Ga. App. 667, 668 (442 SE2d 857) (1994). The trial court found that when the court reporter tried to file the transcript, "we [had] just switched over to the electronic filing system. . . . [T]he attorneys asked for the transcript to be filed, submitted a check for the

7

transcript. . . . [T]he attorneys received a copy of the transcript." The trial court stated to counsel,

> You each have dealt with the Fulton County clerk's office in getting appeals up to the higher courts, and it is not a 30-day ritual. It sometimes does last 4 months, 6 months, a year to get a transcript to go up from the clerk's office; and I think in this case since they received the transcript, they had every indication that everything was good, that there was a reliance on the court reporter, but not an unjust reliance on the court reporter given her track record in this courthouse."

The trial court iterated the court reporter's good record for following through with tasks,[10] and concluded that whether it was "her glitch" or a "system glitch," the transcript "didn't get filed where it should have," but that she "tried to do it," and was "mortified when she found out that it didn't go through."

Given the circumstances of this case, the trial court did not abuse its discretion by finding that Alpha did not cause the delay in filing the transcript and that the delay in filing the transcript was excusable. See generally *Brandenburg v. All–Fleet Refinishing*, 252 Ga. App. 40, 43-44 (6) (555 SE2d 508) (2001) (finding that delay was not inexcusable when it appeared to have been caused by an insurance company,

---

[10] See generally OCGA § 24-2-201 (authorizing trial court to sua sponte take judicial notice of adjudicative fact, not subject to reasonable dispute in that it is generally known within the territorial jurisdiction of the court).

rather than the party); *Welch*, 212 Ga. App. at 667-669 (holding that trial court abused its discretion in dismissing appeal where the record did not affirmatively establish that the appellants were the cause of the delay). Therefore, the trial court did not err in denying Irongate's motion to dismiss Alpha's appeal.

*Case No. A17A0303*

In Case No. A17A0303, Alpha appeals the trial court's grant of Irongate's motion for summary judgment and denial of Alpha's motion for partial summary judgment.

> Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). To prevail on a motion for summary judgment, the moving party must show that there is no genuine dispute as to a specific material fact and that this specific fact is enough, regardless of any other facts in the case, to entitle the moving party to judgment as a matter of law. When a defendant moves for summary judgment as to an element of the case for which the plaintiff, and not the defendant, will bear the burden of proof at trial, the defendant may show that he is entitled to summary judgment either by affirmatively disproving that element of the case or by pointing to an absence of evidence in the record by which the plaintiff might carry the burden to prove that element. And if the defendant does so, the plaintiff cannot rest on his pleadings, but rather must point to specific evidence giving rise to a triable issue. We review a grant or denial of summary judgment de novo and construe the evidence in the

light most favorable to the nonmovant. Because this opinion addresses cross-motions for summary judgment, we will construe the facts in favor of the nonmoving party as appropriate.

(Citations and punctuation omitted.) *Maree v. ROMAR Joint Venture*, 329 Ga. App. 282, 283 (763 SE2d 899) (2014).

It is undisputed that the parties' relationship is governed by the terms of the Fund's Operating Agreement,[11] and that by investing in the Fund, Alpha became a signatory to the Operating Agreement, which formed the contract between Alpha and the Fund Manager and set forth the Fund's withdrawal procedures.[12] The following material facts are also undisputed. On September 23, 2010, Alpha submitted a written request for a full withdrawal of its balance in the Fund; Alpha was subsequently informed that its withdrawal request would be fulfilled; on December 22, 2010, the Fund Manager suspended all withdrawal requests, including Alpha's; and in May 2011,

---

[11] Pursuant to Section 9.7 of the Operating Agreement (which was amended and restated in 2008), "all of the terms and provisions hereof shall be construed under the laws of the State of Delaware and, without limitations thereof, . . . the [Delaware Limited Liability Company] Act shall govern [the Fund] aspects of this Agreement."

[12] See 6 Del. C. § 18-101 (7) ("A member or manager of a limited liability company or an assignee of a limited liability company interest is bound by the limited liability company agreement whether or not the member or manager or assignee executes the limited liability company agreement.").

10

the Fund Manager terminated the Fund and began the winding up process to close the Fund.

1. *Breach of contract.* Alpha contends that Irongate breached the terms of the Operating Agreement, specifically Section 4.2 (a) (i),[13] when: (a) Alpha's right of redemption purportedly vested, but Alpha was not given priority over other Fund

---

[13] Section 4.2 (a) (i) of the Operating Agreement is entitled "Withdrawals" and pertinently provides:

> Except as otherwise provided herein (including with respect to Special Situation Investments) and subject to the Withdrawal Fee (as defined herein), Members have the right, upon seventy (70) days' prior written notice to the Administrator, to make a partial or total withdrawal from their Capital Accounts (and not from their Special Situation Sub-Accounts) as of the last Business Day of each calendar quarter or at such other times as the Manager determines in its sole discretion. The withdrawal amount shall be calculated based upon the Net Asset Value of the withdrawing Member's Capital Account on the effective date of the withdrawal (the "Withdrawal Date"). . . . Subject to the Manager's right to establish reserves, approximately ninety percent (90%) of the amount being withdrawn will generally be paid to the withdrawing Member approximately forty-five (45) days following the applicable Withdrawal Date, with the balance being payable as soon as practicable following the completion of the [Fund's] year-end audit for such year.

11

members during the wind-up process; and (b) Irongate failed to exercise good faith in its decision to suspend redemptions and terminate the Fund before satisfying Alpha's redemption request.

To establish a breach of contract claim, a party must prove: (1) the existence of a contract; (2) the breach of an obligation imposed by the contract; and (3) damages that the plaintiff suffered as a result of the breach. See *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A2d 606, 612 (2003). In this action, the existence of a valid contract is uncontested.

(a) *Purportedly vested redemption right*. Alpha contends that Irongate breached the terms of the Operating Agreement, specifically Section 4.2 (a) (i), when Alpha's right of redemption purportedly vested, but Alpha was not given priority over other Fund members during the wind-up process.

> In contract interpretation, this [Delaware courts] give priority to the parties' intentions as reflected in the four corners of the agreement. [The] Court construes the agreement as a whole, giving effect to all provisions therein. The meaning inferred from a particular provision cannot control the meaning of the entire agreement if such an inference conflicts with the agreement's overall scheme or plan. [The] Court will interpret clear and unambiguous terms according to their ordinary meaning.

12

(Punctuation and footnote omitted.) *La Grange Communities, LLC v. Cornell Glasgow, LLC*, 74 A3d 653, *9 (11) (2013).

Even assuming that pursuant to Section 4.2 (a) (i), Alpha had a right to a full withdrawal/redemption because 70 days had passed from the time of its request, which Irongate disputes, said right was not absolute. The beginning clause of Section 4.2 (a) (i) states that the right to a withdrawal applies "Except as otherwise provided herein," and was limited by other provisions of Section 4.2 (a) which, the evidence showed, applied here and authorized the suspension of withdrawal requests.[14] See

---

[14] Sections 4.2 (a) (iv) and (v) of the Operating Agreement pertinently provide, respectively:

(iv) *Compulsory Withdrawals and Suspension of Withdrawals*: The [Fund] shall have the right to require the compulsory withdrawal of all Interests held by a Member at any time, in the Manager's discretion. In circumstances where the [Fund] is unable to liquidate securities or option positions in an orderly manner in order to fund withdrawals or where the value of the assets and liabilities of the [Fund] cannot reasonably be determined, the [Fund] may take longer than forty-five (45) days to effect settlement of withdrawals or it may even suspend withdrawals as discussed below. In addition, the [Fund] may withhold a portion of any withdrawal if necessary to comply with applicable regulatory requirements.

(v) *Suspension of Withdrawals*. The Manager reserves the right to

13

generally *Bartley v. Holden*, 338 A.2d 137, 141, n. 4 (1975) (noting that the phrase "unless otherwise provided" limited the effect of statutory provision where a contrary statute existed); *United Rentals, Inc. v. RAM Holdings, Inc.*, 937 A.2d 810, 833 (III) (C), n. 106 (2007) (terms such as "subject to" imposed hierarchy among contract provisions).

temporarily suspend or limit withdrawals by the Members if it determines, in its sole discretion, that (A) such withdrawals would negatively affect the [Fund's] financial integrity, (B) there exists a state of affairs that constitutes a state of emergency, as a result of which disposal of the assets owned by the [Fund] is not reasonably practicable or it is not reasonably practicable to determine fairly the value of its assets, (C) there is a breakdown in any of the means normally employed in ascertaining the value of a substantial part of the assets of the [Fund] or when for any other reason the value of such assets cannot reasonably be ascertained (including an inability to make a withdrawal from an Investment Vehicle or termination of an option), (D) the amount of requested withdrawals would result in a disorderly liquidation of [Fund] investments or a violation of the [Fund's] investment policies, (E) it is appropriate or advisable in light of the circumstances under or relating to the Option or other derivative transactions to which the [Fund] is a party, or (F) there exists such other extraordinary circumstances, as determined in good faith by the Manager, that cause withdrawals or such payments to be impracticable under existing economic or market conditions or conditions relating to the [Fund].

14

The record shows that the Fund's investment manager was Irongate Capital Management ("ICM"),[15] and that the person who managed ICM deposed that the Fund was experiencing liquidity issues and that, although he tried, he was unable to generate sufficient liquidity – and particularly from an option related to the separate, reference entity (Irongate Diversified Fund, LLC ) – to pay the various pending withdrawal requests, including Alpha's request.[16] According to the Fund's memorandum of offering, the investment objective and strategy of the Fund was to earn its returns primarily by entering into a particular type of "option" with a designated counterparty whereby the Fund would "obtain, on a leveraged basis, the investment returns of Irongate Diversified Fund, LLC (the "Reference Entity") *without directly investing in the same.*"[17] According to the ICM manager, the counterparty that entered into the option contract with the Fund owned the reference entity to "serve the purpose of meeting the agreement that was the option. . . . [The counterparty] was invested on

---

[15] ICM was engaged by the Fund Manager to act on behalf of Fund members to, among other things, monitor underlying investments of the Fund, maintain records of members, speak with members, and make recommendations. ICM served as an investment manager for other funds besides the Irongate Performance Fund, LLC.

[16] None of the persons who were members both of the Fund and the Fund Manager had outstanding redemption requests in December 2010. And none of them made any withdrawals from the Fund between December 2010 and May 2011.

[17] (Emphasis supplied.)

15

behalf of [the Fund] investors in order to meet the obligations of that option agreement, that derivative agreement." Under the agreement between the counterparty and the Fund, the counterparty had the right to allow or deny the withdrawal of cash from the reference entity, and, in this case, did not allow the release of cash from the reference entity to satisfy redemption requests from the Fund because the reference entity was not meeting set goals related to its liquidity of underlying investments, or its diversification or concentration of the total pool.

Alpha labels the ICM manager's explanation for the decision to suspend withdrawals and terminate the Fund as "false and pretextual." But the only evidence Alpha points to refute the evidence establishing the insufficiency of the Fund's cash balance is the cash balance of the separate reference entity, faulting the Fund Manager for refusing to "allocate cash" from said reference entity to pay Alpha's withdrawal request. However, Alpha points to no provision authorizing such action; and we found none. Instead, as set out above, the evidence established the indirect nature of the Fund's relationship to the reference entity, and the inability of the Fund to liquidate its option related to the referenced entity.[18] Section 4.2 (a) (iv) and (v) of the Operating

_____

[18] See generally *Elder v. Hayes*, 337 Ga. App. 826, 831 (1) (788 SE2d 915) (2016) ("[A] witness's uncontradicted testimony cannot simply be disbelieved in order to eliminate the evidence it provides. Rather, on summary judgment, what one witness

16

Agreement permitted the Fund Manager to suspend withdrawal requests due to the inability to liquidate securities and/or its option related to the reference entity.

Furthermore, Section 7.1[19] of the Operating Agreement permitted the Fund Manager to terminate the Fund "at any time" before the automatic termination date in the year 2054. And pursuant to Section 7.2 (a) (i) and (b) (i),[20] Alpha's withdrawal

---

says on a material point must be genuinely contradicted by some other evidence — what another witness says, a prior statement by the witness, or a document or other piece of physical evidence. Once the pleadings are pierced with actual evidence, the plaintiff must point to admissible evidence showing a genuine issue of fact as summary judgment cannot be avoided based on mere speculation or conjecture.") (citations and punctuation omitted).

[19] Section 7.1 of the Operating Agreement, entitled "Duration," provides as follows: "The [Fund] shall continue until December 31, 2054, unless sooner terminated. The [Fund] may be terminated earlier, at any time, by the Manager or otherwise in accordance with applicable law."

[20] Sections 7.2 (a) (i) and (b) (i) of the Operating Agreement, entitled "Termination," pertinently provide, respectively:

(a) At the time a termination event has occurred in accordance with Sec. 7.1 above: (i) any withdrawal requests that have been submitted to the [Fund] (whether or not such withdrawal requests have been accepted by the [Fund], the Manager or any Affiliate or administrator appointed by the Manager to handle withdrawals) . . . shall be deemed suspended in favor of the winding up process in which all remaining Members (including Members whose withdrawals have been suspended, as set forth in this Sec. 7.2 (a) (i)) will be treated equitably . . . .

17

request which, at the time, had not been paid in any amounts, was "deemed suspended in favor of the winding up process," and distributions of Fund assets would be made first to creditors, the description of which expressly excluded Alpha ("Members' interests in withdrawals that were suspended under Sec. 7.2 (a) (i)," i.e., "whether or not such withdrawal requests have been accepted" by the Fund, Fund Manager, any Affiliate, or duly appointed administrator).

(b) *Implied covenant of good faith*. Alpha contends that Irongate breached the terms of the Operating Agreement when Irongate failed to exercise good faith in its decision to suspend redemptions and terminate the Fund before satisfying Alpha's redemption request. Specifically, Alpha asserts that because Fund Manager members who comprised the majority members of the Fund and were the Fund's general partner, were involved in the decision to suspend withdrawal requests and later terminate the Fund, and non-managing Fund members were not, it is "apparent" that

> (b) On termination of the business of the [Fund], the Manager (or any duly appointed liquidator, as the case may be) shall . . . make distributions out of [Fund] assets in the following manner and order: (i) to creditors, including Members or former Members who are creditors (but expressly excluding Members' interests in withdrawals that were suspended under Sec. 7.2 (a) (i) above or any other section of this Agreement . . . .

18

Irongate's "ulterior motive" and "true motivation" in suspending withdrawal requests and terminating the Fund was to "serve their own self-interests" and that of their family members who were Fund members. The foregoing, Alpha argues, demonstrates a "bad faith breach of the Operating Agreement."

"Under Delaware law, bad faith is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; it is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will." (Punctuation and footnoted omitted.) *SIGA Technologies, Inc. v. Pharmathene, Inc.*, 67 A.3d 330, 346 (III) (B) (2013).

> The implied covenant of good faith and fair dealing involves a "cautious enterprise," inferring contractual terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated. One generally cannot base a claim for breach of the implied covenant on conduct authorized by the agreement. We will only imply contract terms when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected. When conducting this analysis, we must assess the parties' reasonable expectations at the time of contracting and not rewrite the contract to appease a party who later wishes to rewrite a contract he now believes to have been a bad

19

deal. Parties have a right to enter into good and bad contracts, the law enforces both.

(Footnotes and punctuation omitted.) *Nemec v. Shrader*, 991 A.2d 1120, 1125-1126 (2010). "A party does not act in bad faith by relying on contract provisions for which that party bargained where doing so simply limits advantages to another party." Id. at 1128.

At the outset, we note that the uncontroverted evidence showed that the decision to suspend withdrawals was unanimous and included involvement by the Fund Manager, as well as by non-Fund members. The decision to terminate the Fund also included input from a non-Fund member, the ICM manager. The Operating Agreement expressly permitted the complained of actions; uncontroverted evidence revealed the financial position in which the Fund had found itself – investors seeking to bail and an inability to sufficiently liquidate; and Alpha pointed to no specific evidence showing that Irongate's decisions were arbitrary, unreasonable, or undertaken with conscious doing of a wrong because of a dishonest purpose or moral obliquity.

According to the ICM manager, Alpha's redemption request was not the only one that was suspended and not given priority in the winding up process; all pending redemptions were treated in the same manner, with investors receiving, inter alia, cash

20

on a pro rata basis. And Alpha did not offer any evidence to support a reasonable expectation at the time it entered into the Operating Agreement that it could require Irongate to redeem Alpha's interest during a time of financial insecurity. Under the circumstances, the implied covenant of good faith and fair dealing did not apply. See generally *Nemec*, 991 A2d at 1122-1128 (company did not violate good faith covenant by exercising option to redeem retired stock holders' shares to the benefit of working stock holders; company, whose directors stood to benefit from redemption, exercised an express contractual right); *Ross Holding & Mgmt. Co. v. Advance Realty Group, LLC*, 2013 Del. Ch. LEXIS 58, 4-7 (2) (2013) (applying New Jersey law).

As Alpha has failed to meet its burden of pointing to any evidence giving rise to a triable issue on the element of breach, the trial court did not err in granting judgment as a matter of law in favor of Irongate and in denying Alpha's motion for partial summary judgment on the breach of contract claim.

2. *Breach of fiduciary duties*. Alpha contends that Irongate breached its fiduciary duties for the same reasons that it allegedly breached the contract.

> Delaware law is clear that, under traditional principles of equity, a manager of an LLC would qualify as a fiduciary of that LLC and its members. This Court has held that an LLC manager owes fiduciary duties because it has more than an arms-length, contractual relationship with the

21

members of the LLC, and is vested with discretionary power to manage the business of the LLC. . . . As a general matter, corporations and other business entities can owe fiduciary duties, as most easily exemplified in the situation where a corporation, LLC, or other entity is the managing member of an LLC[.]

(Punctuation and footnotes omitted.) *CMS Inv. Holdings, LLC v. Castle*, 2015 Del. Ch. LEXIS 169, 65-68 (V) (A) (2) (2015). Fiduciary duties may involve studying proposed action, determining the appropriateness of the proposed action, setting forth a dissenting view to appropriate parties if necessary, and informing those who would be effected about potential adverse affects of the proposed action. See *Ross Holding & Mgmt. Co.*, 2013 Del. Ch. LEXIS 58, 10 (3). In this case, as allowed by statute,[21] the Operating Agreement exculpated the Fund Manager from liability to "any Member . . . for action . . . which [the Fund Manger] reasonably believed to be in the best interests of the Company[.]"

Notably, as a matter of law, the Fund owed no fiduciary duties to Alpha. See generally *Onex Food Svcs. v. Grieser*, 1996 U. S. Dist. LEXIS 2797, 23-24 (4) (D) (S.D.N.Y., 1996) (under Delaware law, a corporation does not owe a fiduciary duty

---

[21] See 6 Del. C. § 18-1101 (a) - (e) (allowing parties to define, limit, or even eliminate certain duties, including fiduciary duties).

to its shareholders nor may it be held vicariously liable for breaches of fiduciary duty committed by its officers). Regarding the Fund Manager, no member of the Fund Manager was identified as being a member of the counterparty, which entity held the right to allow or deny the withdrawal of cash from the reference entity and, in this case, did not allow proceeds to exit the reference entity; and multiple meetings and discussions were held to address the liquidation issues the Fund was facing. Alpha did not point to any competent evidence showing that the Fund Manager did not study the

choice of actions and that its decisions were not informed.[22] See generally *Ross*

*Holding & Mgmt. Co*., 2013 Del. Ch. LEXIS 58, 8-11 (3).

Moreover, this claim is foreclosed as it arises from a dispute related to the

exercise of a contractual right. See generally *Nemec*, 991 A2d at 1128-1130.

Consequently the trial court did not err in granting judgment as a matter of law to

Irongate.

---

[22] We do not consider Alpha's supplemental responses to Irongate Performance Fund, LLC's first interrogatories and request for production of documents. The interrogatory responses purport to submit an expert witness's proposed testimony that the Fund Manager's conduct "constituted a breach of fiduciary duty." But the interrogatory responses appear to be unsworn statements made by counsel and not statements made under oath by an officer of Alpha, and thus, are not competent evidence. See generally *U. S. Lawns, Inc., v. Cutting Edge Landscaping*, LLC, 311 Ga. App. 674, 678 (1), n. 1 (716 SE2d 779) (2011); *Gregory v. King Plumbing*, 127 Ga. App. 512 (194 SE2d 271) (1972) ("The plain and unambiguous terms of [OCGA § 9-11-33] require a party to answer personally his opponent's interrogatories under oath. Interrogatories are not pleadings and counsel cannot answer them."). Georgia law properly governs this issue. See *Mills v. Berlex Lab*., 235 Ga. App. 873, 876, n. 1 (510 SE2d 621) (1999) ("choice of law provision in a contract does not . . . govern the procedural law applied in the forum state") (citation omitted); *Abalene Pest Control Svc. v. Orkin Exterminating Co.*, 196 Ga. App. 463 (1) (395 SE2d 867) (1990) ("Rules of evidence, the methods of shifting the burden of proof, and the presumptions arising from a given statement of facts, are matters affecting the remedy or procedure.") (citations and punctuation omitted).

Alpha's reliance on *Caspian Select &c. Ltd. v. Gohl*, 2015 Del. Ch. LEXIS 246 (2015), for the proposition that its breach of fiduciary duty claim should survive summary judgment is misplaced, as in that case, fiduciary duty claims survived a motion to dismiss, which involves a different standard than summary judgment. *Caspian Select &c. Ltd*., 2015 Del. Ch. LEXIS 246, 2-3, 23-24 (III) (C) (2015). Alpha's reliance on *Paige Capital Mgmt., LLC v. Lerner Master Fund, LLC*, 2011 Del. Ch. LEXIS 116 (2011), is also misplaced, as that case involved admitted self-dealing by a fund manager. *Paige Capital Mgmt*., LLC, 2011 Del. Ch. LEXIS at 119-127 (4).

3. *Conversion*. Alpha contends that Irongate converted Alpha's money by refusing to "surrender" Alpha's purportedly vested Fund balance, upon demand.

Alpha's conversion claim is based on the same grounds as alleged in its breach of contract claims. Alpha has not pointed to any evidence establishing that Irongate violated an independent legal duty, apart from the duty imposed by contract. Therefore, the trial court did not err in granting judgment as a matter of law in favor of Irongate and denying Alpha's motion for partial summary judgment on this claim. See generally *Akzo Nobel Coatings, Inc. v. Dow Chemical Co*., 2015 Del. Ch. LEXIS 157, 32-33 (III) (D) (2) (2015); *Kuroda v. SPJS Holdings, LLC*, 971 A2d 872, 890 (II) (F) (2009) ("to establish a claim for conversion apart from the contract claim,

[complainant] would have to show that he had a right to the money – other than a right pursuant to the contract – that was violated by the defendants' exercise of dominion over the money").[23]

4. *Unjust Enrichment*. Alpha's challenge to the trial court's summary judgment ruling on the unjust enrichment claim is deemed abandoned due to Alpha's failure to present any argument or authority regarding this issue in his appeal brief. See generally *Roca v. E. I. du Pont &c. Co.*, 842 A.2d 1238, 1242 (2004) ("The failure of a party appellant to present and argue a legal issue in the text of an opening brief constitutes a waiver of that claim on appeal.") (punctuation and footnote omitted); *Nguyen v. Barrett*, 2016 Del. Ch. LEXIS 147, 8 (2016).[24]

*Judgments affirmed. Ellington, P. J., and Andrews, J., concur.*

---

[23] The result would be the same under Georgia law. See generally *ULQ, LLC v. Meder*, 293 Ga. App. 176, 181 (2) (666 SE2d 713) (2008) ("tort claim for conversion cannot be based on the breach of a contractual duty alone").

[24] The result would be the same under Georgia law. See generally *Estate of Nixon v. Barber*, 340 Ga. App. 103, 110 (2) (796 SE2d 489) (2017) (enumerated error abandoned by failing to provide citation to authority in support of same).