**FIFTH DIVISION**
**MCFADDEN, P. J.,**
**BRANCH and BETHEL, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**October 31, 2017**

# In the Court of Appeals of Georgia

A17A0683. MILLER v. FIBERLIGHT, LLC et al.

McFADDEN, Presiding Judge.

In this action, a minority member of a Delaware limited liability company sued the majority members and the chair of the board of directors for, among other things, breach of default fiduciary duties imposed by Delaware law and breach of the duty of good faith and fair dealing. The trial court granted the defendants' motion for summary judgment on all of the plaintiff's claims, and he appeals. We find that the plaintiff's claim that the defendants breached default fiduciary duties by unilaterally rejecting offers to purchase the company depends upon disputed issues of fact. So we reverse the trial court's grant of summary judgment to the defendants on that claim (and the related claims derivative of that claim). We affirm the grant of summary judgment in all other respects.

1. *Facts and procedural posture.*

Michael Miller filed this action challenging certain decisions made by the board of directors of defendant FiberLight, LLC, the Delaware limited liability company of which Miller was a founder, was formerly an officer and member of the board of directors, and in which he currently holds a membership interest. Defendants NT Assets, LLC and Thermo Telecom Partners, LLC are investors in and the majority members of FiberLight.[1] Defendant Jim Lynch is the chair of FiberLight's board of directors.

Miller filed this action after he was terminated from his position as president of FiberLight. He alleges that the defendants breached their fiduciary duties to him and the other minority members of FiberLight and breached the implied covenants of good faith and fair dealing. He appeals the grant of summary judgment to the defendants.

> To prevail on a motion for summary judgment, . . . the moving party must show that there is no genuine dispute as to a specific material fact and that this specific fact is enough, regardless of any other facts in the case, to entitle the moving party to judgment as a matter of law.

---

[1] At some point after the events at issue here, Thermo Telecom Partners transferred its interest in FiberLight to defendants Thermo Development, Inc. and FL Investment Holdings, LLC.

When a defendant moves for summary judgment as to an element of the case for which the plaintiff, and not the defendant, will bear the burden of proof at trial the defendant may show that he is entitled to summary judgment either by affirmatively disproving that element of the case or by pointing to an absence of evidence in the record by which the plaintiff might carry the burden to prove that element. And if the defendant does so, the plaintiff cannot rest on his pleadings, but rather must point to specific evidence giving rise to a triable issue.

*Beale v. O'Shea*, 319 Ga. App. 1, 2 (735 SE2d 29) (2012) (citation and punctuation omitted). We review a summary judgment ruling "de novo, viewing the evidence in the record, as well as any inferences that might reasonably be drawn from that evidence, in the light most favorable to the nonmoving party." Id. (citation omitted).

So viewed, the record shows that Miller was an employee of telecommunications company Xspedius Corporation when he was asked to run Xspedius's fiber business as a separate, subsidiary company. Thermo Telecom Partners was the principal owner of Xspedius. For the next year or two, the subsidiary company was called Xspedius Fiber Group. Defendant Jim Lynch and nonparty Jay Monroe, who owns Thermo Telecom Partners, were Miller's bosses.

On April 22, 2005, the entity ceased to be known as Xspedius Fiber Group and became FiberLight, LLC. At that time, Thermo Telecom Partners, Miller, Kevin

Coyne, Ron Kormos, and two other individuals entered a limited liability company agreement governing the operation of FiberLight. The agreement was amended multiple times. The crux of Miller's complaint is that he was coerced by economic duress to agree to the amendments, which enabled the defendants to redeem most of Miller's interest in FiberLight upon his termination.

Although the limited liability company agreement was amended multiple times, certain provisions were identical from one version to the next. For example, all versions provided that the agreements were governed by and would be construed under the law of Delaware. All versions provided that the board of directors was deemed the manager of FiberLight for purposes of the Delaware Limited Liability Act.

The initial agreement set out the members' ownership interests in FiberLight as follows: Miller owned 21.111 percent, Thermo Telecom Partners owned 5 percent, and Coyne, Kormos, and the other individuals owned the remaining 73.889 percent. The initial agreement established a three-member board of directors. Two directors would be elected by the vote of members holding a majority of the percentage interests, while Thermo Telecom Partners had the right to designate the third director. Lynch was Thermo Telecom Partners's designated director as well as the chairman

of the board. Miller was a director and the president, and Coyne was a director and the chief financial officer. The initial agreement provided that it could only be amended with the unanimous consent of the members. It provided that the officers served at the pleasure of the board, which could remove them from office at any time with or without cause. Defendant NT Assets was not a party to the first agreement.

The second agreement, entitled "second amended and restated limited liability company agreement," reflected the repurchase and allocation of an individual owner's interest in the company, which resulted in an increase in Miller's interest to 32.7704 percent and an increase in Thermo Telecom Partners' interest to 6.4678 percent. The provisions establishing a three-member board of directors, describing the election of those board members, providing for the removal of officers, and requiring unanimity of the members to amend the agreement were unchanged from the initial agreement. Defendant NT Assets was not a party to the second amended agreement.

The pivotal third amended and restated limited liability company agreement, effective as of January 1, 2006, made many changes. Significantly, it reflected the conversion of the more than $10 million in outstanding debt FiberLight owed to its largest creditors, Thermo Telecom Partners and NT Assets, into equity in Fiberlight. Formerly creditors (with Thermo Telecom Partners owning a 6.4678 percent

5

membership interest), Thermo Telecom Partners and NT Assets were now members holding the largest membership interest in the company. Thermo Telecom Partners' expansion of its membership interest and NT Assets' acquisition of a membership interest reduced the individual members' membership interests accordingly.

Further, the third agreement divided the members' interests into two classes: investor interests, which were based on the amount of money the particular member had invested in the company, and incentive interests, which were intended to compensate the individual members, who were also employees of FiberLight, upon the sale of the business. Under the third agreement, Thermo Telecom owned a 25.9869 percent investor interest and NT Assets owned a 72.3536 percent investor interest, for a total ownership interest of 98.3405 percent of the company. Miller owned a .5804 percent investor interest and a .0010 percent incentive interest, for a total ownership of .5814 percent; Kevin Coyne owned a .5562 percent investor interest and a .0010 percent incentive interest, for a total ownership interest of .5572 percent; and Ron Kormos, the final individual member, owned a .5199 percent investor interest and a .0010 percent incentive interest, for a total ownership interest of .5209 percent.

The third agreement required the redemption of the individual member's interests should that member's employment be terminated, directing that the "Company shall purchase all of the Investor Interest then owned by the Terminated Member" and that "the Company shall redeem the entire unvested portion of such terminated employee's Incentive Interest," although the board could waive the right to automatic redemption of the incentive interests.

The third amended agreement also changed the structure of the board of directors, giving Thermo Telecom Partners and NT Assets the right to jointly designate up to three directors, so long as they held a majority of the percentage interests; they designated Lynch as a director but had the right to add two more directors at any time. Miller and Coyne remained directors.

The third agreement added a provision that was absent from the initial agreement and the second amended and restated agreement about the voting of directors. The new voting provision stated that

> [e]ach Director shall have one (1) vote at all board meetings, except that so long as Thermo and NT Assets collectively hold a majority of the Percentage Interests, the following rules shall apply to any votes taken by the Board at any duly called Board meeting: (a) if there is one (1) Thermo/NT Assets Designee on the Board, then such Thermo/NT Assets Designee shall have three (3) votes; (b) if there are two (2) thermo/NT

7

Assets Designees on the board, then each such Thermo/NT Assets Designee shall have two (2) votes; and (c) if there are three (3) Thermo/NT Assets Designees on the Board, then each such Thermo/NT Assets Designee shall have one (1) vote. For any action to be adopted by the Board, such action must be either (1) approved by the affirmative vote of Directors having a total of at least three (3) votes at duly called Board meeting, or (ii) approved by written consent of all Directors then serving on the Board.

So Miller and Coyne each had one vote, and as long as Thermo Telecom Partners and NT Assets had one designated director, they had three votes, which allowed them to adopt any action unilaterally. Previously, as noted, the limited liability agreement could only be amended with the unanimous consent of the members.

The fourth amended and restated limited liability company agreement, effective as of October 27, 2008, made no changes about which Miller complains. (Although the trial court found that the fourth amended agreement reduced Miller's interest and increased Thermo Telecom Partners' and NT Assets' interests, the agreement in the appellate record listing the parties' interests does not reflect such a change.)

The fifth amended and restated limited liability company agreement, effective as of March 17, 2011, changed terms used to calculate payouts to investors should

8

FiberLight be sold under certain conditions. It reduced the individual members' interests and increased Thermo Telecom Partners' and NT Assets' interests.

Miller, Coyne, and Kormos each invested between $56,000 and $60,000 in FiberLight. Thermo Telecom Partners and NT Assets invested more than $14 million. Miller understood that when a company borrowed money, the lender gained more control. He conceded that Thermo Telecom Partners' and NT Assets' converting their debt to equity was not improper but instead was a financial strategy. But he did not believe the conversion of the debt into equity should have impacted his own equity position. (He testified that he believed the first and second operating agreements were entered *after* Thermo Telecom Partners' and NT Assets' conversion of FiberLight's debt to equity, although the third agreement, by its terms, was entered to reflect that change.)

Miller perceived the third amended agreement as "basically stripp[ing him] of [his] 25 percent position in the company to about .0058 something or a half a percent, which was significant." Miller did not think the incentive interest structure established in the third amended agreement benefitted him because previously he had had a much larger piece of the company. He would have preferred not to have his interest diluted by additional capital contributions, given the sweat equity he had in

9

the company. He thought the incentive interests were too low. Additionally, although he understood that the company no longer had an option but was required to redeem the investor interests, he did not agree with that change.

Miller summed up agreements three, four, and five as follows:

Each one of those agreements did not allow and did not provide any substantial rights for the minority shareholders at all, including me. There was nothing in those agreements that allowed us to retain our equity. There was nothing in those agreements that would give us any protection as it applies to those equity and incentive interests. . . . [they] were continued efforts to strip me of any of my equity or incentive interest.

After Miller was terminated from FiberLight and his interests largely redeemed, he filed this action.

2. *Breach of fiduciary duties*.

Miller argues that the trial court erred in granting summary judgment to the defendants because the question of whether they breached fiduciary duties they owed to Miller as the owner of a minority interest in FiberLight depends on disputed issues of fact. He argues that the defendants breached their fiduciary duties to him in three respects: they coerced him via economic duress into signing the third, fourth, and

fifth amended agreements; they terminated his employment and redeemed his interests in the company; and they rejected offers to purchase FiberLight.

(a) *Default fiduciary duties under Delaware law.*

Miller does not base his claims upon any fiduciary duty imposed in the limited liability company agreements. Instead, he bases his claims upon fiduciary duties imposed by default under Delaware law.

When a Delaware limited liability company agreement is silent on the issue of fiduciary duties, Delaware law now imposes default fiduciary duties. In 2013, "the Delaware Legislature . . . pass[ed] an amendment that provides for default fiduciary duties." *CSH Theatres, LLC v. Nederlander of San Francisco Assns.*, 2015 Del. Ch. LEXIS 115, *34-35 n.54 (III) (C) (1) (Del. Ch. 2015). See 6 Del. C. § 18-1104 ("In any case not provided for in this chapter, the rules of law and equity, including the rules of law and equity relating to fiduciary duties and the law merchant, shall govern."). The statute, however, became effective August 1, 2013, well after these agreements were entered. 6 Del. C. § 18-1104. Whether such default duties applied to limited liability company agreements entered before 2013 — such as the agreements at issue here — is not absolutely clear.

11

According to dicta in a 2012 Delaware Supreme Court opinion,"whether the [pre-2013 Delaware] LLC statute [did] — or [did] not — impose default fiduciary duties is one about which reasonable minds could differ." *Gatz Properties, LLC v. Auriga Capital Corp.*, 59 A3d 1206, 1219 (III) (C) (Del. 2012). See generally Mohsen Manesh, *Damning Dictum: The Default Duty Debate In Delaware*, 39 J. Corp. L. 35, 54–63 (2013). The Delaware Supreme Court did not answer the question, but it did recognize that a "long line of Chancery[2] precedents [have held] that default fiduciary duties apply to the managers of an LLC." *Feeley v. NHAOCG, LLC*, 62 A3d 649, 660 (II) (D) (1) (Del. Ch. 2012) (collecting cases). And even in the period between the Delaware Supreme Court's *Gatz* decision and the statutory fix, the Chancery Court continued to find such default duties. Id. at 660-661 (II) (D) (1). Accordingly, we follow the long line of Chancery precedents to find that default fiduciary duties applied to the agreements at issue in this appal. Such default fiduciary

---

[2]According to its website, "The Delaware Court of Chancery is widely recognized as the nation's preeminent forum for the determination of disputes involving the internal affairs of the thousands upon thousands of Delaware corporations and other business entities through which a vast amount of the world's commercial affairs is conducted. Its unique competence in and exposure to issues of business law are unmatched." http://courts.delaware.gov/chancery\/ (retrieved October 2, 2017).

duties include the duties of care and loyalty. *McKenna v. Singer*, 2017 Del. Ch. LEXIS 138, *41-42 (II) (B) (Del. Ch. 2017).

(i) *The duty of care.*

"The duty of care requires that [managers] act on an adequately informed basis with [manager] liability for a duty of care violation predicated upon concepts of gross negligence." *McKenna*, supra, at *41-42 (citation and punctuation omitted). "[A] lack of due care [is] fiduciary action taken solely by reason of gross negligence and without any malevolent intent[,]" *In re Walt Disney Co. Deriv. Litig.*, 906 A2d 27, 64 (2) (Del. 2006), meaning an intent "having, showing, or arising from intense often vicious ill will, spite, or hatred." https://www.merriam-webster.com/dictionary/malevolent (retrieved October 3, 2017). Malevolent polices are those that are "so plainly unwise as to be irreconcilable with honest . . . intelligent [] judgment." *Salnita Corp. v. Walter Holding Corp.*, 168 A.74, 76 (Del. Ch. 1933).

(ii) *The duty of loyalty.*

"The duty of loyalty mandates that the best interest of the [company] and its [members] takes precedence over any interest possessed by a [manager], officer or controlling [member] and not shared by the [members] generally." *McKenna*, supra,

13

at *42 (II) (B) (citation and punctuation omitted). The duty of loyalty prevents managers from using "their position of trust and confidence to further their private interests." *Cede & Co. v. Technicolor, Inc.*, 634 A2d 345, 361 (Del. 1993). (Although *Cede* involved corporate directors, "managers of Delaware limited liability companies owe the same fiduciary duties as directors of Delaware corporations when the limited liability company agreement does not opt out of fiduciary duties." *McKenna*, supra, at *41 (II) (B) (citations omitted).)

(b) *The operating agreements did not exclude the default fiduciary duties.*

The defendants argue that certain provisions in the operating agreements (provisions that were identical in the third, fourth, and fifth amended agreements) excluded the default fiduciary duties. See 6 Del. C. § 18-1101 (c) ("To the extent that, at law or in equity, a member or manager or other person has duties (including fiduciary duties) to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement, the member's or manager's or other person's duties may be expanded or restricted or eliminated by provisions in the limited liability company agreement; provided, that the limited liability company agreement may not eliminate the implied contractual covenant of good faith and fair dealing.").

14

"Drafters of an LLC agreement must make their intent to eliminate fiduciary duties plain and unambiguous." *Feeley*, 62 A3d at 664 (II) (D) (2) (citation and punctuation omitted). The intent must be explicit. *Kelly v. Blum*, 2010 Del. Ch. LEXIS 31, *46 (II) (B) (2) (a) (Del. Ch. 2010). Indeed, as demonstrated by the citations in the margin, the effective elimination of the default fiduciary duties often requires the use of the words "fiduciary duties" or the express statement that all duties are eliminated.[3]

---

[3]See, e.g., *Wiggs v. Summit Midstream Partners, LLC*, 2013 Del. Ch. LEXIS 84, *37-38 (III) (E) (2) (Del. Ch. Mar. 28, 2013) ("Summit shall have no duties (including fiduciary duties) or liabilities relating thereto to [Management] or to the other Members, except as may be specifically provided [in the Agreement] and required by any provisions of the [Delaware LLC] Act or other applicable law that cannot be waived. Accordingly, [Summit] shall be entitled to act solely on its own behalf, and in its own interests.") (punctuation and footnote omitted); *CNL-AB LLC v. Eastern Property Fund I SPE (MS Ref) LLC*, 2011 Del. Ch. LEXIS 25, *38 (II) (B) (2) (Del. Ch. 2011) ("The execution, delivery or performance by the Managing Member . . . of any agreement authorized or permitted under this Agreement shall be in the sole and absolute discretion of the Managing Member *without consideration of any other obligation or duty, fiduciary or otherwise*, of the Company or the Members and shall not constitute a breach by the Managing Member of any duty that the Managing Member may owe the Company or any Non—Managing Member or any other Persons under this Agreement or of any duty stated or implied by law or equity.") (emphasis added and footnote omitted); *In re Atlas Energy Resources, LLC*, 2010 Del. Ch. LEXIS 216, *21-22 (III) (A) (1) (Del. Ch. 2010) ("[W]henever a potential conflict of interest exists or arises between any Affiliate of the Company, on the one hand, and the Company or any Group Member, on the other, any resolution or course of action by the Board of Directors in respect of such conflict of interest shall be permitted and deemed approved by all Members, and shall not

15

None of the provisions to which the defendants point include such explicit language. Specifically, the defendants argue that the following provisions eliminated any default duty of care owed by members and directors:

> **4.2 Limited Liability; Exculpation**. Except as expressly set forth in this Agreement or required by law, no Member shall be personally liable for any debt, obligation, or liability of the Company, whether arising in contract, tort, or otherwise, solely by reason of being a Member of the Company. Neither the Company nor any Director or officer shall have any right claim, or cause of action against any Member of the Company arising out of such Member having acted or failed to act in accordance with such Member's rights or obligations as a Member hereunder.

---

constitute a breach of this Agreement . . . or of *any duty existing at law, in equity or otherwise, including any fiduciary duty*, if the resolution or course of action in respect of such conflict of interest is (i) approved by Special Approval, (ii) approved by the vote of holders of a majority of the Outstanding Common Units (excluding Common Units held by interested parties), (iii) on terms no less favorable to the Company than those being generally available to or available from unrelated third parties or (iv) fair and reasonable to the Company, taking into account the totality of the relationships between the parties involved (including other transactions that may be particularly favorable to the Company).") (emphasis added and footnote omitted); *Fisk Ventures, LLC v. Segal*, 2008 Del. Ch. LEXIS 158, *41-42 (III) (C) (Del. Ch. 2008) ("[T]he [limited liability company agreement] eliminates fiduciary duties to the maximum extent permitted by law by flatly stating that members have no duties other than those expressly articulated in the Agreement. Because the Agreement does not expressly articulate fiduciary obligations, they are eliminated.").

**5.3 Limited Liability; Exculpation**. Except as expressly set forth in this Agreement or required by law, no Director shall be personally liable for any debt, obligation, or liability of the Company, whether arising in contract, tort, or otherwise, solely by reason of being a Director of the Company. Neither the Company nor any Member or Officer shall have any right, claim, or cause of action against any Director arising out of such Director's having acted or failed to act in accordance with such Director's rights or obligations hereunder.

The defendants argue that the following provision eliminated the default duty of loyalty:

**4.13 Members May Participate in Other Activities.** Members and their Affiliates and Directors, either individually or with others, shall have the right to participate in other business ventures of every kind, whether or not such other business ventures compete with The Company. No Member, acting in the capacity of a Member, shall be obligated to offer to the Company or to the other Members any opportunity to participate in any such other business venture. Neither the Company nor the other Members shall have any right to any income or profit derived from any such other business venture of a Member.

The defendants also argue that the entire agreement paragraph eliminates default fiduciary duties:

**14.1 Entire Agreement**. This Agreement, including the schedules attached hereto, and any subscription agreement executed by the

17

Members relative to their respective Membership Interests, constitute the entire agreement among the Members with respect to the subject matter hereof, and supersede all prior and contemporaneous agreements, representations, and understandings of the parties. No party hereto shall be liable nor bound to the other in any manner by any warranties, representations, or covenants with respect to the subject matter hereof except as specifically set forth herein.

None of these paragraphs plainly, unambiguously, and explicitly eliminate default fiduciary duties. Consequently, we find, as did the trial court, the default fiduciary duties apply to the decisions that Miller challenges here.

(c) *Coercion*.

Miller argues that the defendants breached the fiduciary duties they owed him by coercing him through economic duress to sign amendments to Fiberlight's operating agreement that advantaged defendants over Miller by reducing the value of Miller's interest in the company. Miller claims that this economic duress took the form of threats to terminate him: he was told to sign the agreements or he would be fired.

He argues that critical changes resulted from the coerced execution of the third and fifth agreements: the management members of FiberLight were stripped of any meaningful control; the defendants via Lynch gained voting control of the board of

18

directors and the authority to terminate managers; the defendants took a controlling interest in the equity of FiberLight; the incentive interest structure was introduced; and the possible value of the incentive interest was capped, channeling excess value to the investor interests, held almost entirely by the defendants. In essence, Miller concedes that the operating agreements allowed the defendants to terminate him and to redeem his membership interest in the company, but argues that the defendants may not rely on the operating agreements because he was coerced into signing them.

(i) *Third amended agreement.*

Miller's claim that the defendants breached fiduciary duties by coercing him through economic duress into signing the third amended agreement fails. The defendants were not majority members when Miller signed the third amended agreement, so they owed him no fiduciary duties at that time.

Under the second amended agreement, Thermo Telecom Partners had only a 6.4678 membership interest in FiberLight and NT Assets had no interest. "[M]inority members of an LLC do not owe fiduciary duties to other members." *Marino v. Grupo Mundial Tenedora, S.A.*, 810 FSupp2d 601, 608 (S.D.N.Y. 2011) (applying Delaware law). The trial court observed in the order granting summary judgment to the defendants,

[u]nder the Second Amendment, Thermo Telecom only held 6.4678% in FiberLight; Miller, Coyne, and another individual together held the majority interest. Thermo Telecom became a majority member by virtue of its debt to equity conversion, which was memorialized in the Third Amendment. Before the third Amendment was executed, Thermo Telecom did not hold a majority membership interest and any duress would be because of [its] large creditor position in FiberLight and not by virtue of [its] status as FiberLight members.

But "[i]n contrast to a controlling [member], a [limited liability company's] creditor — even one that owns a majority of the [company's] debt — does not owe fiduciary duties to [members]. It is well established in Delaware corporate law that the obligations of creditors to [business] debtors are governed by contract, not fiduciary duty principles." *Hamilton Partners, L.P. v. Highland Capital Mgmt., L.P.*, 2014 Del. Ch. LEXIS 72, *42 (III) (C) (Del. Ch. 2014) (citation omitted).

Morever, the undisputed evidence is that at the time Miller signed the third amended agreement, the defendants lacked the authority to terminate him. Under the second agreement, Thermo Telecom Partners had the right to designate one of the three directors. Miller and Coyne were the other two directors and held the other two votes. NT Assets was not a member, had no voice in choosing the directors, and had no vote. The second agreement gave the board the right to remove officers. Thus the

20

defendants, with one vote to the individual members' two, lacked the power to terminate Miller from his position at the time he signed the third amended agreement. Miller concedes this fact in his appellate brief, stating that it was the third amended agreement itself that granted Lynch, as the designated representative of the Thermo Companies, the authority to terminate Miller.

So the trial court did not err by granting the defendants summary judgment on Miller's claim that the defendants breached fiduciary duties when they forced him to sign the third amended agreement by coercing him with threats of termination. That claim is defeated by the undisputed facts.

(ii) *Fourth and fifth amended agreements.*

As observed above, Miller claims that the defendants wrongfully diminished his membership interest in FiberLight. And although he concedes that the operating agreements allowed FiberLight to do so, he implicitly argues that the agreements should be disregarded because his consent to those agreements was coerced. But the failure of Miller's claim as to the third amended agreement defeats his claims that the defendants breached their fiduciary duties by enforcing the fourth and fifth amended agreements. This is because it was the *third* amended agreement that gave Thermo Telecom Partners and NT Assets the right to enact the fourth and fifth amended

agreements, even without Miller's consent. Simply put, the defendants had the unilateral right –- given to them under the third amending operating agreement — to enact the fourth and fifth amended operating agreements, and their exercise of their rights under those agreements did not breach the common law default fiduciary duties of care and loyalty owed to Miller.

Miller has not cited, and we have not found, any Delaware authority supporting the proposition that a party taking action specifically authorized under a limited liability company agreement breaches a default fiduciary duty. Rather, Delaware law is clear that provisions in a limited liability company's operating agreement supersede default fiduciary duties. See *2009 Caiola Family Trust v. PWA, LLC*, 2014 Del. Ch. LEXIS 261, *36-37 (5) (C) (Del. Ch. 2014). ("A limited liability company organized under Delaware law may displace fiduciary duties altogether or tailor their application by the terms of its operating agreement.") (citation and punctuation omitted). The trial court did not err in granting summary judgment on any claims based on coercion of the fourth and fifth amended agreements.

(b) *Miller's termination and the redemption of his interest.*

Miller argues that whether the defendants breached the default fiduciary duties owed to him by redeeming his interest in the company upon his termination depends

22

upon disputed issues of fact. (Miller acknowledges he was an employee at will and he is not seeking wrongful termination damages.) But a party taking action specifically authorized under a limited liability company agreement does not breach a default fiduciary duty. *2009 Caiola Family Trust*, supra. Miller concedes that the operating agreements authorized the redemption of his interests. The trial court did not err in granting summary judgment on this claim.

(c) *Rejection of offers to purchase FiberLight.*

Miller argues that whether the defendants breached their fiduciary duties to him by rejecting offers to purchase Fiberlight depends upon disputed issues of fact. The defendants counter, and the trial court found, that FiberLight never received any such offers. This is a disputed issue of fact.

First we address the defendants' argument that Miller waived this claim by raising it for the first time in his response to the defendants' motion for summary judgment. In his amended complaint, Miller alleged that the defendants rejected "at least one offer to purchase FiberLight at a substantial profit to both the majority and minority members," and that "[b]y this and other conduct . . . [the defendants] breached the fiduciary duties they owed to Miller." Contrary to the defendants' position, Miller "quite clearly pled claims" that the defendants breached their

23

fiduciary duties to him by rejecting offers to purchase Fiberlight. *Duffield v. Chui*, 314 Ga. App. 214, 215 n. 3 (723 SE2d 506) (2012).

> We find no merit in [the defendants'] contention that this argument is not properly before us because [Miller] did not raise it below. The Georgia Civil Practice Act requires only notice pleading and, under the Act, pleadings are to be construed liberally and reasonably to achieve substantial justice consistent with the statutory requirements of the Act.

*Rucker v. Columbia Nat. Ins. Co.*, 307 Ga. App. 444, 446 (1) (a) (705 SE2d 270) (2010).

As for the merits of Miller's argument, we agree that whether the defendants breached default fiduciary duties by rejecting offers to purchase FiberLight depends upon disputed issues of fact. Although the defendants denied there were any such offers, Miller testified about offers to purchase FiberLight from Quanta Services, General Atlantic, and Summit LLC. According to Miller, Lynch unilaterally rejected all three offers.

Miller testified that in 2008, Quanta sent FiberLight a letter of intent, which he described as a firm but not binding offer to buy the company, but Lynch rejected it without explanation. Lynch testified that the communication from Quanta was a letter

24

of intent, not an offer, and that he had discussions with the senior management team, but "they chose not to go forward."

In 2011, according to Miller, FiberLight engaged two firms to investigate selling the company, resulting in the identification of eight potential purchasers and final offers to purchase. Miller testified that General Atlantic was the highest bidder and made a firm offer pending due diligence. During due diligence, General Atlantic found some accounting issues and reduced the offer price. According to Miller, Lynch was offended because General Atlantic had said the offer price was firm, and he cut off negotiations without consulting the minority members, including Miller. Lynch, on the other hand, acknowledged that General Atlantic "participated in the sale process that we engaged in in 2011," but testified that "they never got to the point where they had a firm price."

Finally, Miller testified that in 2011 or the summer of 2012, Summit LLC submitted an offer in excess of $400 million for FiberLight with no contingencies, pending due diligence. According to Miller, Summit had proceeded through the due diligence process. But Lynch rejected the offer because Summit reduced the offer price. Lynch did not consult Miller before rejecting the offer. Lynch, on the other hand, testified that "Summit chose not to move forward" because it was not

comfortable with certain potential FiberLight liabilities, and Summit's inquiries never proceeded to the due diligence stage.

Miller testified that he and the other minority members had no influence as to whether to accept any offers. Initially, he was "under the assumption . . . that the management team actually had a decision process in the sale of the company and that we could influence that sale with Jim [Lynch]. Later [in 2008] [he] found out [they] didn't have any influence related to that and it was solely his decision . . . ." He added that he "had no decision-making capabilities at all. That it was all Jim Lynch."

Given this conflicting testimony, we find that whether the defendants rejected offers to purchase FiberLight, thereby breaching default fiduciary duties, depends on disputed issues of material fact. See generally *Gantler v. Stephens*, 965 A2d 695, 704-709 (I) (Del. 2009). Consequently, the trial court erred by granting summary judgment to the defendants on this claim.

3. *Statute of limitation.*

Miller argues that the trial court erred by ruling that his claims arising from the third amended operating agreement are barred by the statute of limitation. Given our holding in Division 2 (c) (i) that the defendants are entitled to summary judgment on

the claims arising from the third amended operating agreement, we do not reach this issue.

4. *Breach of covenant of good faith and fair dealing.*

Miller argues that the trial court erred in granting the defendants summary judgment on his claim for breach of the covenant of good faith and fair dealing. The trial court ruled that there was no such breach because the terms of the agreements allowed the defendants to terminate Miller and redeem his membership interests. Miller argues that the reasoning is flawed because he was coerced into signing the amended agreements. For the reasons discussed above, this argument lacks merit.

Miller also argues that regardless of whether the agreements allowed the defendants to redeem his membership interests, he should be allowed to pursue this claim because the covenants protect reasonable expectations, and he expected a substantial return on his investment in FiberLight, an expectation that was confirmed when Lynch told him that Fiberlight would "do right" by him.

> The implied covenant of good faith and fair dealing attaches to every contract, and requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain. Nevertheless, Delaware law requires that the contract's express terms be honored, and prevents a party who has after-the-fact regrets

27

from using the implied covenant of good faith and fair dealing to obtain in court what it could not get at the bargaining table. [T]o state a claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must allege a specific obligation implied in the contract, a breach of that obligation, and resulting damages. This [c]ourt cannot invoke an implied covenant, however, to re-write the agreement between the parties, and should be most chary about implying a contractual protection when the contract could easily have been drafted to expressly provide for it.

*CMS Investment Holdings, LLC v. Castle*, 2015 Del. Ch. LEXIS 169, *55-56 (IV) (C) (Del. Ch. 2015) (citations and punctuation omitted). "Existing contract terms control, however, such that implied good faith cannot be used to circumvent the parties' bargain, or to create a free-floating duty unattached to the underlying legal document. Thus, one generally cannot base a claim for breach of the implied covenant on conduct authorized by the terms of the agreement." *Dunlap v. State Farm Fire & Cas. Co.*, 878 A2d 434, 441 (C) (Del. 2005) (citations and punctuation omitted). In other words, "[a] party does not act in bad faith by relying on contract provisions for which that party bargained where doing so simply limits advantages to another party." *Alpha Balanced Fund, LLLP v. Irongate Performance Fund, LLC*, 342 Ga. App. 93,

28

102-103 (1) (b) (802 SE2d 357) (2017) (applying Delaware law; citation and punctuation omitted).

Miller does not dispute that the actions of which he complains were allowed under the agreements. He would imply a contract term that prevented the defendants from exercising explicit contract terms. But "the implied covenant cannot be invoked to override express provisions of a contract." *Kuroda v. SPJS Holdings, LLC*, 971 A2d 872, 888 (Del. Ch. 2009). See generally *Nemec v. Shrader*, 991 A2d 1120, 1122-1128 (Del. 2010) (company did not violate good faith covenant by exercising option to redeem retired stockholders' shares to the benefit of working stockholders; company, whose directors stood to benefit from redemption, exercised an express contractual right). Compare *Merrill v. Crothall-American, Inc.*, 606 A2d 96, 101 (V) (Del. 1992) (whether employer breached implied covenant of good faith and fair dealing by *inducing* employee to enter employment contract through fraud, deceit, or misrepresentation was a jury question).

Finally, in support of his argument that the defendants breached the duty of good faith by redeeming his membership interest, Miller points to a provision in the agreement stating that "The removal of an Officer who is also a Member shall not affect the rights of such Officer as a Member and shall not in itself constitute the

withdrawal, resignation, retirement, or expulsion of such Member." He argues that redeeming his interest upon his termination affected his rights as a member in violation of this provision. "The limiting aspect of this argument is that specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one." *Wiggs*, supra, 2013 Del. Ch. LEXIS 84, at *38 (III) (E) (2) (citation omitted). As discussed above, the agreement specifically allowed the defendants to redeem Miller's interests. The trial court did not err by granting the defendants summary judgment on this claim.

5. *Remaining claims*.

Miller argues that we should reverse the grant of summary judgment to the defendants on his claims for aiding and abetting a breach of fiduciary duty, breach of contract, oppression, declaratory judgment, punitive damages, and attorney fees because those rulings were based entirely on the trial court's decision on his breach of fiduciary duty and breach of the covenant of good faith and fair dealing claims. Because we reverse in part the grant of summary judgment to the defendants on the breach of fiduciary duty claims, we also reverse the grant of summary judgment to the defendants on Miller's claim for aiding and abetting a breach of fiduciary duty.

30

Likewise, we reverse the grant of summary judgment to the defendants on Miller's claims for punitive damages and attorney fees, which the trial court granted only on the basis that none of Miller's claims survived summary judgment.

However, Miller's breach of contract, oppression, and declaratory judgment claims are not derivative of his claim that the defendants breached their default fiduciary duties by rejecting offers to buy FiberLight, the only claim on which we reverse the trial court's grant of summary judgment. And Miller makes no argument in support of his enumeration that the trial court erred in granting summary judgment on these claims. Therefore, we affirm the grant of summary judgment on Miller's claims for breach of contract, oppression, and declaratory judgment.

*Judgment affirmed in part and reversed in part. Branch and Bethel, JJ., concur.*