**SECOND DIVISION**
**MILLER, P. J.,**
**RICKMAN and REESE, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**June 21, 2019**

# In the Court of Appeals of Georgia

A19A0005. MILLER v. LYNCH et al.

MILLER, Presiding Judge.

This is the second appearance of this case before the Court, the previous appearance being reported in *Miller v. FiberLight, LLC*, 343 Ga. App. 593 (808 SE2d 75) (2017) ("*Miller I*"). Michael Miller appeals from the trial court's grant of the defendants' motion for directed verdict, arguing that the trial court's decision purported to re-adjudicate the same issue we decided in *Miller I* and that the evidence would have allowed a jury conclusion that the defendants breached their fiduciary duties to him by rejecting offers to purchase FiberLight, LLC ("FiberLight"). Miller also appeals from the trial court's grant of the defendants' motions in limine and the trial court's decision regarding sanctions against the defendants. For the reasons elucidated below, we affirm in part and reverse in part.

"A trial court may direct a verdict only if there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom, shall demand a particular verdict." (Citation omitted.) *King v. Ga. Dept. of Corrections*, 347 Ga. App. 606 (820 SE2d 445) (2018). "Where *any* evidence — even slight evidence — supports the opposing party's case, a directed verdict is improper. We review the grant of a motion for directed verdict de novo, construing the evidence in favor of the nonmovant." (Citation omitted.) Id.

So viewed, the evidence at trial showed that FiberLight is a Delaware limited liabilty company that provides fiberoptic services for various technology companies. Miller was the chief executive officer of FiberLight and owned a minority interest in the company. Defendants Thermo Development, Inc., FL Investment Holdings, LLC, NT Assets, LLC and Thermo Partners, LLC (collectively, "Thermo"), are the majority members of FiberLight, and James F. Lynch, is the executive chairman of FiberLight's board of directors.[1] As the Thermo designee, Lynch also has the majority of votes on FiberLight's board.

FiberLight's operations were governed by a limited liability company agreement, which was periodically amended. The fourth amended operating

---

[1] Throughout the record, Lynch is also referred to as Jim Lynch.

agreement, effective October 27, 2008, contained a schedule projecting how the proceeds of a sale would be distributed if the company were to be sold in 2007, 2008, 2009, 2010, or 2011. The fifth amended operating agreement, effective March 17, 2011, set out a different schedule for the allocation of proceeds from a potential sale. Miller testified, "when the operating agreements were put in place, they always had a . . . it looked like about a five-year plan for selling the company. And that's what the schedules proved out to show as well." Miller added that this was consistent with discussions with Lynch "coming up on 2011."

In April 2011, Lynch reported numerous bids for the purchase of FiberLight to other individuals associated with the company. One bid was from a private equity firm, General Atlantic, at a price of $325 million. A second bid was from another private equity company, Summit, at a price of $320 million. Lynch's email also mentioned a plan to invite another one of the bidders to "meet management" and that management presentations could begin the following week. A letter of intent from General Atlantic, dated June 16, 2011, detailed a "non-binding proposal to acquire" FiberLight. General Atlantic explained the assumptions on which its valuation was based, its financing arrangements, and the projected timing for the acquisition. General Atlantic also indicated it had received investment committee approval,

subject to due diligence and "customary closing conditions." Miller testified that General Atlantic pursued due diligence, a process in which he was involved. Miller explained this due diligence process and testified, "after we got through all that, it went back into [Lynch's] court to negotiate the deal." Miller, however, testified that Lynch thereafter stated that General Atlantic had "retraded" (meaning the company wanted to change the price), and therefore "[Lynch] wasn't doing the deal." Lynch did not inform Miller of General Atlantic's new bid amount.

According to Lynch, General Atlantic had submitted an acceptable and "very strong offer," and there was a meeting scheduled with General Atlantic representatives. Lynch testified, "[w]e were going to go to New York, close ourselves in a room, get the asset purchase agreement done because we agreed on price, come up with a final document. But that was it. It didn't happen." On August 2, 2011, Lynch sent an email to various persons working with FiberLight, including an analyst and Thermo's lawyer, stating, "GA retraded as I expected they would and we are done."

As to Summit's bid, Miller testified that around the end of 2011, he met with Summit, who wanted to "re-engage with FiberLight to buy the company." Summit submitted a letter of intent, dated March 10, 2012, in which it presented an

4

investment summary and identified its source of funds for the acquisition and anticipated closing conditions. Miller testified that Summit engaged in a "very detailed" due diligence process. Miller testified, however, that Lynch "said the same thing he did on [General Atlantic]. He said they retraded the deal, and we're not going forward with it."

At the close of all the evidence, the defendants moved for a directed verdict. They argued that when this case first came before this Court on appeal, we reversed the grant of summary judgment to the defendants because there were fact issues regarding whether the defendants had rejected offers to purchase FiberLight, and the evidence at trial showed that there were no binding offers that were capable of being accepted. Miller responded that his position was not that the letters of intent were final binding offers but that the defendants had shut down negotiations. Miller's counsel later contended that the defendants, acting through Lynch, "shut down negotiations, cut off negotiations, didn't do a deal that could have been done, and that's the breach of fiduciary duty." The trial court granted the motion for directed verdict, determining that although there were letters of intent, because there was no "binding offer," there was nothing to accept, and, resultantly, there was no breach.

5

The defendants also argued that (1) the decision not to sell FiberLight was protected under the business judgment rule; (2) an exculpatory provision in the fifth amended operating agreement barred Miller's claims; and (3) and Miller had not presented any evidence of his damages. The trial court did not rule on any of these arguments.

Miller appeals from (1) the trial court's grant of the directed verdict; (2) the trial court's ruling on its motion for sanctions against the defendants; (3) the trial court's grant of motions in limine filed by the defendants; and (4) the trial court's determination that he had no valid claim for prejudgment interest. We address each argument in turn.

1. First, Miller argues that the grant of the directed verdict was clear legal error because the trial court violated this Court's binding holding in *Miller I*. Miller adds that even without an analysis of whether the trial court failed to abide by the holding in *Miller I*, the grant of the directed verdict should still be reversed. We agree that the grant of directed verdict was improper.

"The requirements which must be met in a directed verdict situation are very strict." *Hall v. Rome Auto. Co.*, 181 Ga. App. 621, 623 (3) (353 SE2d 542) (1987).

A motion for directed verdict should not be granted where there exists even slight material issues of fact, because the trial court is substituting its judgment for the jury's; only when there is an absence of evidence or when no evidence supports an essential element of the case should a directed verdict be granted, because the trial judge takes the determination of the facts from the jury. The appellate review of directed verdicts is based upon the "any evidence" rule to support the case of the nonmoving party; when there is "any evidence," a directed verdict must be reversed. The direction of a verdict is proper only where there is no conflict in the evidence as to any material issue, and the evidence introduced, with all reasonable deductions therefrom, shall demand a particular verdict. When there is opinion evidence, circumstantial evidence, presumptions of fact, or evidence subject to more than one reasonable construction, the appellate courts shall carefully scrutinize the grant of a directed verdict, because such evidence may be construed as providing the "any evidence" creating a jury question.

(Citation omitted.) *Canton Plaza, Inc. v. Regions Bank, Inc.*, 315 Ga. App. 303, 303-304 (732 SE2d 449) (2012). See also OCGA § 9-11-50 (a).

When this case last came before the Court, we determined that the grant of summary judgment to the defendants was improper because "whether the defendants rejected offers to purchase FiberLight, thereby breaching default fiduciary duties, depend[ed] on disputed issues of material fact." *Miller*, supra, 343 Ga. App. at 606 (2) (e). In ruling on the defendants' motion for directed verdict, the trial court ruled

7

that the that the letters of intent were not binding offers which FiberLight could have accepted.

Importantly, Miller not only argued that the defendants rejected offers to purchase FiberLight; he repeatedly contended that they breached fiduciary duties to him by shutting down or cutting off negotiations with the companies that had demonstrated interest in purchasing FiberLight. Miller added that Lynch made such decisions without consulting either the board of directors or FiberLight's minority owners. And, under Delaware law, one who manages an LLC can breach fiduciary duties to minority members of the LLC by his "failure to negotiate with an interested buyer in good faith — [this conduct] is governed by traditional fiduciary duties of loyalty and care." *Auriga Capital Corp. v. Gatz Properties*, 40 A3d 839, 858 (IV) (A) (2) (Del. Ch. Jan. 27, 2012), judgment entered sub nom. *Auriga Capital Corp. v. Gatz Properties, LLC* (Del. Ch. Feb. 23, 2012), affd., 59 A3d 1206 (Del. 2012).

We are cognizant that in his complaint Miller claimed that Lynch rejected at least one *offer*, and he did not specifically allege a theory regarding terminated sale negotiations. Nevertheless, "a plaintiff may sue on one theory and recover on another so long as the complaint adequately states a claim for relief." (Citation omitted.) *Walker v. Gowen Stores LLC*, 322 Ga. App. 376 (745 SE2d 287) (2013). Although

8

the defendants argue that Miller "shifted" his theory of the case, they do not claim, much less demonstrate, that this caused them prejudice. See *Rogers v. Carmike Cinemas, Inc.*, 211 Ga. App. 427, 430 (3) (439 SE2d 663) (1993) ("Although [plaintiff] did not make a formal motion to amend her complaint to specify this legal theory, she did assert this theory of recovery at trial. Defendant, who did not object to the evidence as it unfolded so as to encompass this theory, has shown no prejudice from the absence of express articulation in the complaint.").

Here, Miller testified that the best time to sell the company was in 2011 or 2012, explaining that FiberLight had not been adding many fiberoptic networks at that point and the company was "going to hit a huge economic wall in 2012, '13, and '14, and that's exactly what happened." According to Miller, Lynch did not seriously consider the General Atlantic or Summit bids or negotiate in good faith, and FiberLight was "turning everything down" and "shut[ting] down all discussions" while companies around them were selling. Indeed, as explained above, Lynch testified that General Atlantic's bid was "very strong," and that it was appropriate for FiberLight's "mix of business." In fact, Miller explained that the bid from General Atlantic was above the number that FiberLight had expected, and while he was never told how much the bid was being reduced by, it could have withstood even a 10

9

percent reduction. Although Lynch testified that he was unable to "close the deal" with General Atlantic because General Atlantic would not receive bank financing, an email from Lynch reads, "GA retraded as I expected they would and we are done." As to Summit's bid, Miller testified that a retrade was not a good reason to end discussions. Also, Miller testified that Lynch never came to him or the other board members to discuss the bids, and that he made his decisions singlehandedly. An investment banker involved in the sales process testified, "[y]ou would always inform the owners or the board as to the bids that came in and the price."

There was evidence at trial, however slight, that Lynch was not negotiating with interested buyers in good faith, supporting Miller's claim for a breach of fiduciary duties. *Freyermuth v. Chon*, 212 Ga. App. 845, 846 (443 SE2d 636) (1994) (noting that in order to prevail on a motion for directed verdict, "there must be no evidence of any kind supporting [the opposing party's] position."); *Auriga Capital Corp.*, supra, 40 A3d at 859, 875 (IV) (B) (determining that manager of the LLC breached his fiduciary duties to the minority shareholders by "turning away a responsible bidder which could have paid a price beneficial to the LLC and its investors"). See also *Gantler v. Stephens*, 965 A2d 695 (Del. 2009) (reversing lower court's dismissal of lawsuit by minority shareholders against officers and directors

for violating their fiduciary duties, at the bidding stage, by "rejecting a valuable opportunity to sell the company"). Because a directed verdict cannot be granted if there is any evidence to support a contrary verdict, the trial court's decision was error.

The defendants urge the Court to affirm the trial court's grant of the motion for directed verdict on the various other grounds that they argued before the trial court, namely: (1) an exculpatory provision in FiberLight's fifth amended operating agreement precluded Miller from bringing his claims; (2) the defendants' decision to not sell FiberLight is protected by the business judgment rule; and (3) Miller cannot prove his damages.

Although "in other circumstances application of [the right for any reason] rule might be warranted, in the posture of this case it is not appropriate for us to do so." *Robert, Ltd. v. Parker*, 215 Ga. App. 310, 311 (2) (450 SE2d 219) (1994). "In effect, the trial court's grant of the directed verdict pretermitted the issues concerning [the applicability of the exculpatory provision or the business judgment rule] and decided the case based upon [Miller's] failure to prove that [the defendants breached fiduciary duties]. Thus, the trial court made no rulings on the [applicability of the exculpatory provision or the business judgment rule] or on the question of . . . damages, . . . which

11

are issues to be decided by the trial court in the first instance." Id. Thus, "we decline to address these issues before the trial court has done so." Id.

2. Next, Miller argues that the trial court committed reversible error by ordering that the defendants pay $45,000 in attorney fees and expenses. In Miller's view, this was an "insignificant sanction" that did not sufficiently punish the defendants for their discovery violation. This enumeration presents no grounds for reversal.

"Trial courts have broad discretion to control discovery, including the imposition of sanctions." (Footnote omitted.) *ASAP Healthcare Network, Inc. v. Sw. Hosp. & Med. Ctr., Inc.*, 270 Ga. App. 76, 77 (1) (606 SE2d 98) (2004). "As a general rule, a trial court should . . . reserv[e] the sanctions of dismissal and default for the most flagrant cases — where the failure to comply is wilful, in bad faith or in conscious disregard of an order." (Citation omitted.) *Motani v. Wallace Enterprises, Inc.*, 251 Ga. App. 384, 385 (1) (554 SE2d 539) (2001); *McConnell v. Wright*, 281 Ga. 868, 869 (644 SE2d 111) (2007) (cautioning against the use of harsh sanctions such as a default judgment except in "extreme cases"). Moreover, we will not "interfere with a trial judge's exercise of the broad discretionary powers authorized

12

under the discovery provisions of the Civil Practice Act in the absence of an abuse of discretion." (Citation omitted.) *Motani*, supra, 251 Ga. App. at 385 (1).

Miller filed a motion for sanctions against the defendants in January 2018. Miller argued that less than three days before the consolidated pretrial order was due the defendants produced letters of intent to acquire FiberLight following the sale process, which the company embarked on in 2011, as well as e-mails demonstrating significant market interest in acquiring FiberLight. Miller requested that the trial court strike the defendants' answer and enter a default judgment against them.

Former counsel for the defendants, who oversaw the collection of documents from the various clients, averred that he had retrieved potentially responsive documents from both the defendants and the law firm, but that there were some documents that they had inadvertently neglected to produce from the firm's internal corporate counsel files. At the hearing on Miller's motion, the defendants again represented that the delay was inadvertent and argued that when the failure to produce was discovered, the documents were promptly produced.

After argument, the trial judge indicated that she had read the parties' briefs and would award Miller attorney fees related to the motion. The trial court later ordered the defendants to pay $45,000 in attorney fees, insofar as the late production

13

of the documents caused Miller to incur fees and expenses to address the issues raised by the late production.

Under these circumstances, we determine that the trial court did not abuse its broad discretion by not imposing a more severe sanction. See *Anderson v. Silver*, 300 Ga. App. 1, 5 (684 SE2d 73) (2009) (noting that although plaintiff was "dilatory and evasive" the trial court abused its discretion in dismissing plaintiff's complaint). Thus, this enumeration of error lacks merit.

3. Next, Miller argues that the trial court abused its discretion in granting various motions in limine to exclude evidence, filed by the defendants. According to Miller, the trial court erred in disallowing evidence that Miller was terminated from his employment "without cause" in February 2013 (and his interest in FiberLight was reduced as a result), as well as evidence introducing changes to the FiberLight operating agreement which progressively reduced the benefits that he would receive from a sale. We agree in part.

"If . . . the trial court decides to rule on the admissibility of evidence prior to trial, the court's determination of the admissibility is similar to a preliminary ruling on evidence at a pretrial conference and it controls the subsequent course of action . . . ." (Citation and emphasis omitted.) *Hand v. Pettitt*, 258 Ga. App. 170, 172 (1) (a)

14

(573 SE2d 421) (2002). "We review a trial court's ruling on a motion in limine for abuse of discretion." (Footnote omitted.) *Shiver v. Ga. & Florida Railnet, Inc.*, 287 Ga. App. 828 (1) (652 SE2d 819) (2007). Simultaneously,

> by its very nature, the grant of a motion in limine excluding evidence suggests that there is no circumstance under which the evidence under scrutiny is likely to be admissible at trial. In light of that absolute, the grant of a motion in limine excluding evidence is a judicial power which must be exercised with great care.

*State of Ga. Dept. of Transp. v. Douglas Asphalt Co.*, 297 Ga. App. 470, 471 (677 SE2d 699) (2009).

As explained in *Miller I*, Miller was an at-will employee, and he is not seeking wrongful termination damages. *Miller I*, supra, 343 Ga. App. at 604 (1) (d). And, the defendants "did not make the reasons for [Miller's] termination an issue in the case." *Burritt v. Media Marketing Svcs., Inc.*, 242 Ga. App. 92, 93 (1) (527 SE2d 890) (2000). Thus, although Miller complains of a pattern of misconduct and hostile behavior on the defendants' part, whether Miller was wrongfully terminated in 2013 was not relevant and "presented no issue for jury resolution." Id. (where the issue at trial was whether plaintiff received a seven-day notice of termination, the contract was terminable at will, and the defendant did not make the reasons for plaintiff's

15

termination an issue, "any improper motive for [plaintiff's] discharge" was irrelevant and presented no issue for jury resolution).

Regarding the operating agreements evidencing Miller's progressively reduced interest in FiberLight, however, we cannot say that such evidence would not be relevant under any circumstances. Miller argues that the defendants were incentivized to reject above-market offers to purchase FiberLight until they further reduced his share of potential sale proceeds, along with the shares of other minority owners. As we noted in *Miller I*, the fifth amended agreement "reduced the individual members' interests and increased Thermo Telecom Partners' and NT Assets' interests." *Miller*, supra, 343 Ga. App. at 597 (1). The October 27, 2008 fourth amended operating agreement shows that Miller's incentive interest[2] in FiberLight was .0010 percent. In the fifth amended operating agreement, which became effective in March 2011, this interest was reduced to .0008 percent. Additionally, charts in both operating agreements appear to confirm that Miller would have received a significantly higher percentage of potential sale proceeds under the 2008 fourth amended operating

---

[2] The incentive interest was "intended to compensate the individual members, who were also employees of FiberLight, upon the sale of the business." *Miller I*, supra, 343 Ga. App. at 595 (1).

agreement, as compared to when the operating agreement was subsequently modified in 2011.

Insofar as Miller has alleged that the defendants were holding off on selling FiberLight as they progressively reduced his interest in the company, and they would directly benefit from these changes in the event of a later sale, the jury may infer from the changes in the operating agreements that the defendants had a motive to reject valid above-market bids. At the very least, the relevance of this evidence is "doubtful" and thus the grant of the motion in limine was improper. See *Hand*, supra, 258 Ga. App. at 172-173 (1) (a) ("The Georgia rule favors the admission of any relevant evidence, no matter how slight its probative value; evidence of doubtful relevance or competency should be admitted and its weight left to the jury.") (citation omitted); *Newman v. Roberts*, 147 Ga. App. 157 (1) (248 SE2d 217) (1978) (trial court properly admitted evidence where it may have been of assistance to the jury in understanding the sequence of events surrounding the execution of a note and the relationships which existed between the parties at the time the note was executed); *Colonial Pipeline Co. v. Westlake Club, Inc.*, 112 Ga. App. 412, 415 (4) (145 SE2d 669) (1965) ("This evidence was, at least, of doubtful relevancy to the issues in the

case, and the rule in this State where the admissibility of evidence is doubtful is to admit it and leave its weight and credit for the jury's consideration.").

4. Lastly, Miller argues that the trial court erred in determining that he did not have a claim for prejudgment interest.[3] The trial court's ruling was proper.

First, we reject Miller's claim that he was entitled to prejudgment interest pursuant to OCGA § 13-6-13. "OCGA § 13-6-13 provides for prejudgment interest in *breach of contract* cases, as follows: In all cases where an amount ascertained would be the damages at the time of the breach, it may be increased by the addition of legal interest from that time until the recovery." (Emphasis supplied.) *Braner v. Southern Trust Ins. Co.*, 255 Ga. 117, 119 (1) (335 SE2d 547) (1985); *H & H Subs, Inc. v. Lim*, 223 Ga. App. 656, 659 (3) (478 SE2d 632) (1996) ("Section 13-6-13 applies to contract actions.").

We have recognized that prejudgment interest under this statute may be available in a "tort action" involving a breach of a duty where the duty "aris[es] from a contractual right." *Tower Financial Svcs., Inc. v. Smith*, 204 Ga. App. 910, 916 (2),

---

[3] Regardless of whether the defendants used a proper procedure in an attempt to preclude Miller from presenting evidence regarding prejudgment interest, we will address the trial court's decision that the claim lacked merit. *Exxon Corp. v. Dept. of Transp.*, 202 Ga. App. 43, 43-44 (1) (413 SE2d 238) (1991).

918 (4) (423 SE2d 257) (1992). As we stated in *Miller I*, however, "Miller does not base his claims upon any fiduciary duty imposed in the limited liability company agreements. Instead, he bases his claims upon fiduciary duties imposed by default under Delaware law." *Miller I*, supra, 343 Ga. App. at 598 (2) (a), (b). These include duties of loyalty and care, which we determined had not been eliminated by the operating agreements. Id. at 599-601 (2) (a). Thus, the default fiduciary duties at issue did not arise from any contractual right, and prejudgment interest would not have been available under OCGA § 13-6-13. See *H & H Subs, Inc.*, supra, 223 Ga. App. 656 at 659 (3) (prejudgment interest under OCGA § 13-6-13 was not available because the lawsuit "sound[ed] in tort"); *Stratton Indus., Inc. v. Northwest Ga. Bank*, 191 Ga. App. 683, 687 (2) (a) (382 SE2d 721) (1989) (upholding award of prejudgment interest under OCGA § 13-6-13 because the verdict was based on a "contract theory").

Also, contrary to Miller's assertion, his potential damages in this case are not liquidated so as to provide for prejudgment interest under OCGA § 7-4-15. Under this statute,

> [a]ll liquidated demands, where by agreement or otherwise the sum to
> be paid is fixed or certain, bear interest from the time the party shall

19

become liable and bound to pay them; if payable on demand, they shall bear interest from the time of the demand. In case of promissory notes payable on demand, the law presumes a demand instantly and gives interest from date.

"The word 'liquidated' as used in OCGA § 7-4-15 means 'settled, acknowledged, or agreed.'" *Holloway v. State Farm Fire & Cas. Co.*, 245 Ga. App. 319, 321 (1) (b) (537 SE2d 121) (2000). Thus, "[d]amages are liquidated when they are an amount certain and fixed, either by the act and agreement of the parties, or by operation of law; a sum which cannot be changed by the proof; it is so much or nothing." (Citation omitted.) *Carter v. Ravenwood Dev. Co.*, 249 Ga. App. 603, 605 (2) (549 SE2d 402) (2001).

This is not a case in which Miller, if successful at trial, stands to receive either a specific verdict amount or nothing at all, because there are different potential sales involved. And the jury, based on the proof, will determine the time(s) at which the defendants breached fiduciary duties to Miller, if any. See *Holloway*, supra, 245 Ga. App. at 321 (1) (b) ("A claim is unliquidated when there is a bona fide contention as to the amount owing."). Thus, the trial court properly concluded that Miller did not have a valid claim for prejudgment interest under OCGA § 7-4-15.

Given the foregoing, we reverse the grant of the directed verdict and the exclusion of evidence regarding Miller's reduced ownership interest as evidenced by the operating agreements, but otherwise affirm the trial court's rulings at issue.

*Judgment affirmed in part and reversed in part. Rickman and Reese, JJ., concur.*